# United States Court of Appeals
## For the First Circuit

No. 16-1572

VICENTE GONZÁLEZ ET AL.,

Plaintiffs, Appellants,

v.

ROGELIO VÉLEZ ET AL.,

Defendants, Appellees,

OCTAVIO OTERO ET AL.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Howard, Chief Judge,
Selya, Circuit Judge, and
McConnell, District Judge.*

Nicolás Nogueras-Cartagena and Nogueras Law & Associates on
brief for appellants.
Michael J. Carlson, Litigation Attorney, United States Army
Litigation Division, and Rosa Emilia Rodríguez-Vélez, United
States Attorney, on brief for appellees.

---

*Of the District of Rhode Island, sitting by designation.

July 24, 2017

**SELYA**, **Circuit Judge**.  This is a federal-sector employment discrimination case, in which the plaintiffs have attempted to improve their lot by invoking extravagant theories of liability.  The plaintiffs' theories run headlong into an impenetrable barrier forged by the combination of the Civil Service Reform Act (CSRA), see 5 U.S.C. § 1201 (and scattered sections of Title 5 of the U.S. Code), and Title VII, see 42 U.S.C. §§ 2000e to 2000e-17.  The plaintiffs' claims cannot breach this barrier either by cloaking them in the raiment of the Bivens doctrine, see Bivens v. Six Unknown Named Agents of FBN, 403 U.S. 388, 389 (1971), or by garbing them as causes of action brought under the Racketeer Influenced and Corrupt Organizations Act (RICO), see 18 U.S.C. §§ 1961-1968.  Accordingly, we affirm the district court's dismissal of the plaintiffs' third amended complaint.

## I.  BACKGROUND

Because this appeal follows the granting of a motion to dismiss, we draw the facts from the operative version of the complaint.  See Butler v. Balolia, 736 F.3d 609, 611 (1st Cir. 2013).  We are at liberty, though, to supplement those facts with facts "gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice."  Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011).

Plaintiff-appellant Vicente González and plaintiff-appellant Víctor Franco were hired in 1996 as civilian employees of the Department of Army Civilian Police (DACP). As such, both men were attached to the Army garrison at Fort Buchanan in Guaynabo, Puerto Rico. By 2007, González had risen to the rank of chief. Franco remained an investigator. At that time, long-simmering workplace conflicts came to a boil: the plaintiffs allege that they were victims of a "witch hunt," culminating in a criminal investigation instigated by a cadre of coworkers and supervisors.

In February of 2007, González's direct supervisor, James Adamski, announced plans to leave his post as the head of the Directorate of Emergency Services (DES) at Fort Buchanan. González told Adamski privately of his interest in the position. This news spread — and it did not receive unanimous acclaim. According to the plaintiffs, some of their colleagues hatched a plot to keep the job in the hands of a non-Puerto Rican and non-Hispanic individual. The plot had its genesis (the plaintiffs say) in the belief that such an individual would be more likely to acquiesce in the garrison's corrupt culture.

To put meat on these bones, the plaintiffs asserted that the garrison commander (Stephen Ackman) and a staff judge advocate (Mark Nozaki) resented González's refusal to cooperate with their pernicious practices, which included wiping away valid traffic citations and conducting warrantless electronic surveillance.

Adamski, Ackman, Nozaki, Raymond Johnson (the garrison's fire chief), and Gunner Pederson (the garrison's deputy commander) "all conspired to ensure that González could not compete for the DES Director's opening, and to terminate his employment as Chief of Police of the DACP."  Relatedly, the conspirators contrived to have Johnson, rather than González, appointed as the interim DES director.  Other DACP personnel — including Rogelio Vélez, Octavio Otero, and Edwin Sepúlveda — were part of the conspiracy.  As such, they began spreading false and defamatory information about the plaintiffs.  For example, Vélez and Otero approached a federal prosecutor and instigated a criminal investigation of the plaintiffs' activities.  In this regard, they told the prosecutor that González had been using his position for personal gain and that Franco had been employing his security credentials for "inappropriate purposes."

The plaintiffs further alleged that the prosecutor swallowed this bait hook, line, and sinker: he relayed the negative information to the Criminal Investigations Division (CID), which then assigned two agents, Billy Higgason and Ramón Román, to look into the matter.  In the course of the probe, Vélez gave a sworn statement, describing several examples of González's purported abuse of his authority.  For instance, Vélez said that González had nullified several traffic citations in exchange for money or favors, had falsified a DACP investigator's training certificate,

had attempted to interfere with the detention of a suspected drug smuggler, and had solicited investments in his sister-in-law's music album from coworkers. Sepúlveda confirmed that González had asked him to invest $2,000 in the sister-in-law's music album. So, too, Otero identified a number of instances in which González ostensibly had taken actions that were either illegal or improper.

According to the complaint, Otero also implicated Franco. He told investigators that Franco had brought a relative into the garrison and allowed him to leave with several cases of liquor. The investigators were given security videotape purporting to show Franco loading boxes into a vehicle.

With the CID investigation underway, Ackman — in consultation with Nozaki and Pederson, among others — decided to suspend the plaintiffs. He placed González and Franco on administrative leave in April of 2007, but they continued to receive their regular pay and benefits.

In the plaintiffs' view, it became crystal clear, as early as May 31, that there was no probable cause to bring criminal charges. Nevertheless, Franco was not allowed to return to work until late July. Even then, he was assigned mundane tasks for approximately four months until he was permitted to return to his regular work.

The investigation continued until mid-November of 2007, when the CID issued a report finding no evidence of illegal

activity. Despite this finding, Johnson had González's security clearance revoked near the end of November. As late as the following February, Pederson urged that the revocation remain in effect. González's security clearance was not restored until April of 2008 — and it was not until then that González regained his former position.

While still on administrative leave, the plaintiffs — both of whom are Hispanic and Puerto Rican — began complaining about disparate treatment due to race and national origin. They sought advice from the Army's Equal Employment Opportunity (EEO) office, which provided counseling and, in memoranda documenting the completion of that counseling, notified each plaintiff of his right to file a formal complaint within fifteen days. There is no allegation that González ever filed a formal EEO complaint.

Franco, however, filed a formal complaint within the prescribed time period. He received a final decision on June 11, 2007, which concluded that "no employment harm" had occurred because Franco had not experienced any loss of pay or pay grade. This decision explicitly warned that Franco had a limited time in which to take further action: he could either appeal the decision to the Equal Employment Opportunity Commission (EEOC) within thirty days or file suit in federal court within ninety days. See 29 C.F.R. §§ 1614.402(a), 1614.407(a). Franco did neither.

On March 17, 2008 (well over ninety days after Franco's receipt of the final administrative decision), González and Franco joined forces and filed this action in the federal district court.[1] Their complaint named twelve defendants (all sued in their personal capacities): Vélez, Otero, Sepúlveda, Adamski, Johnson, Ackman, Nozaki, Pederson, Higgason, Román, Berta Santiago (a Fort Buchanan detective), and Jorge Quiñones (a DACP investigator). We skip over a salmagundi of intervening pleadings, not relevant here, and focus on the plaintiffs' third amended complaint. That complaint alleged deprivations of the plaintiffs' First, Fourth, Fifth, and Fourteenth Amendment rights and sought damages under the Bivens doctrine. See 403 U.S. at 389. It also proffered RICO claims, see 18 U.S.C. §§ 1961-1968, positing that the named defendants conspired "to defraud the criminal investigation process and to fabricate a fraudulent criminal investigation against [p]laintiffs." In support of the RICO claims, the complaint set forth a laundry list of predicate acts, see id. § 1961(1), including obstruction of justice, see id. § 1503; obstruction of criminal investigations, see id. § 1510; obstruction of state or local law enforcement, see id. § 1511; tampering with a witness,

_____

[1] The plaintiffs' spouses and their respective conjugal partnerships were named as plaintiffs and remain parties to this appeal. Their claims are purely derivative, though, and for ease in exposition, we refer to González and Franco as if they were the sole plaintiffs and appellants. Our decision is, of course, binding on all parties.

victim, or informant, see id. § 1512; mail fraud, see id. § 1341; and wire fraud, see id. § 1343.

The defendants moved to dismiss, asserting, inter alia, want of personal and subject-matter jurisdiction and failure to state an actionable claim. See Fed. R. Civ. P. 12(b)(1)-(2), (6). The plaintiffs dropped their claims against Adamski and Quiñones and disavowed their First Amendment claims, but opposed the motion in all other respects. About six and one-half years after the filing of the dismissal motion — a delay resulting, at least in part,[2] from a disorienting record, a steady influx of haphazard filings, and muddled briefing — the district court granted the motion and entered judgment in the defendants' favor. See González v. Otero, 172 F. Supp. 3d 477, 509 (D.P.R. 2016). The court dismissed all claims against Otero, Sepúlveda, Ackman, Nozaki, Higgason, and Román because the plaintiffs had failed to serve them within the allotted time and had not shown good cause for this failure. See id. at 498; see also Fed. R. Civ. P. 4(m). The plaintiffs have not challenged this ruling on appeal.

---

[2] Some part of this delay was attributable to the court's effort to ascertain the applicability vel non of the Westfall Act, see 28 U.S.C. § 2679(d)(1), and whether the United States should be substituted for certain defendants. Because this issue ultimately proved to be a dead letter and the district court's handling of it has no bearing on the outcome of the present appeal, there is no need to describe what transpired.

As to the other defendants (Vélez, Johnson, Pederson, and Santiago), the court ruled that the plaintiffs could not dodge the preclusive effect of the CSRA and Title VII by "creatively" pleading causes of action. González, 172 F. Supp. 3d at 503-06. In expounding upon this point, the court explained that, had the plaintiffs brought their claims under the appropriate statutes, they would be time-barred because they had failed to comply with various administrative procedures and deadlines. See id. at 496-97. Using a belt-and-suspenders approach, the court held, in the alternative, that various defendants were entitled to either absolute or qualified immunity. See id. at 506-08.

This timely appeal ensued.

## II. ANALYSIS

We review de novo a district court's order granting a motion to dismiss. See SEC v. Tambone, 597 F.3d 436, 441 (1st Cir. 2010) (en banc); Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009). We accept as true all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor. See Grajales v. P.R. Ports Auth., 682 F.3d 40, 44 (1st Cir. 2012). We are not bound by the lower court's reasoning, though, "but may affirm the order of dismissal on any ground made manifest by the record." Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012) (quoting Román-Cancel v. United States, 613 F.3d 37, 41 (1st Cir. 2010)).

The parties' briefs raise an ear-splitting cacophony of issues. We cut through the noise and focus on an issue that we find dispositive of this appeal: preclusion.

Federal-sector employment claims typically take one of two paths. The first path runs through the CSRA, which constitutes "a comprehensive system for reviewing personnel action[s] taken against federal employees." United States v. Fausto, 484 U.S. 439, 455 (1988). Such personnel actions include any actions undertaken in contravention of an employee's constitutional rights. See Irizarry v. United States, 427 F.3d 76, 77-78 (1st Cir. 2005); see also 5 U.S.C. § 2301(b)(2) ("All employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management . . . with proper regard for their . . . constitutional rights."). As a general matter, the CSRA occupies much of the field and (with some exceptions) precludes resort to other forms of redress. See Elgin v. Dep't of the Treasury, 567 U.S. 1, 11-12 (2012) ("Given the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions, it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court."); see also Fausto, 484 U.S. at 455 (holding that CSRA precluded federal employee from bringing backpay suit against government).

Some types of claims, though, are excluded from the CSRA's monopoly over federal-sector employment actions. In particular, the statute "shall not be construed to extinguish or lessen" rights or remedies available under certain anti-discrimination statutes. 5 U.S.C. § 2302(d). As relevant here, Section 717 of Title VII creates a private right of action for federal employees with respect to workplace discrimination on the basis of, inter alia, race or national origin. See 42 U.S.C. § 2000e-16. This maps the contours of the second path through which federal-sector employment cases may proceed.

These paths sometimes intersect. When a federal employee attributes an adverse employment action in part to bias based on race or national origin in derogation of federal antidiscrimination laws, his case becomes a "mixed case." See Perry v. MSPB, 137 S. Ct. 1975, 1979 (2017). This term — "mixed case" — signifies that the federal employee's case is governed partially by the CSRA and partially by Title VII. See Kloeckner v. Solis, 568 U.S. 41, 44-45 (2012). The distinction is consequential because, among other things, the two statutes have different jurisdictional trappings. In a typical case, CSRA claims must be presented to the agency-employer itself and, if pursued further, reviewed by the Merit Systems Protection Board (MSPB), with subsequent litigation taking place in the Court of Appeals for the Federal Circuit. See id. In contrast, standard Title VII

- 12 -

claims must proceed in accordance with regulations promulgated by the EEOC and subsequent litigation starts in a federal district court.  See Mach Mining, LLC v. EEOC, 135 S. Ct. 1645, 1649 (2015).

Here, the plaintiffs' allegations are a jumble. Stripped to their core, they seem to present a mixed case.  The plaintiffs complain of discrimination based on race and national origin, as well as discrimination based on their unwillingness to tolerate corrupt practices within the garrison.  Specific procedures exist for the prosecution of such mixed cases: the aggrieved employee may file a discrimination complaint with the employing agency itself, typically with its EEO office, or may file a complaint with the MSPB.  See Kloeckner, 568 U.S. at 44-45; Rodriguez v. United States, 852 F.3d 67, 84 (1st Cir. 2017). Either route comes with its own administrative processes.  See Kloeckner, 568 U.S. at 45.  A claimant cannot avoid those processes and their concomitant deadlines by the simple expedient of masquerading an employment discrimination claim in the guise of a different legal theory.  See Brown v. Gen. Servs. Admin., 425 U.S. 820, 835 (1976) (holding that federal employee who missed deadline for filing Title VII claim could not bring suit based on alleged discriminatory conduct under Declaratory Judgment Act); cf. Tapia-Tapia v. Potter, 322 F.3d 742, 745 (1st Cir. 2003) (finding appellant's age discrimination allegations "not justiciable" when styled as constitutional claims because Age Discrimination in

Employment Act "provides the exclusive federal remedy for age discrimination in employment").

In this case, the plaintiffs have not made any effort to prosecute claims under the CSRA and, in any event, the district court had no jurisdiction to hear such claims. See Irizarry, 427 F.3d at 78-79. Nor have the plaintiffs attempted to resurrect their Title VII claims; their third amended complaint does not so much as mention Title VII and, even apart from that omission, the record makes manifest that neither plaintiff has met the relevant Title VII deadlines.

Faced with this inhospitable legal landscape, the plaintiffs try to breathe life into their federal-sector employment claims by carving out two additional paths to relief. On the facts of this case, both paths are dead ends.

To begin, the plaintiffs asseverate that the Constitution itself provides an avenue, under the aegis of the Due Process Clause, for bringing federal-sector employment claims against coworkers and supervisors in their individual capacities. For this proposition, they rely on the Supreme Court's decision in Bivens. As we explain below, Bivens cannot carry the weight that the plaintiffs load upon it.

In Bivens, the Court held that a Fourth Amendment violation by federal agents, acting under color of governmental authority, gave rise to a cause of action for money damages against

- 14 -

those agents in their individual capacities.  See Bivens, 403 U.S. at 389.  The basis for recognizing such a new constitutional tort and, thus, allowing such suits to proceed, is — as the plaintiffs suggest — derived from the Constitution itself.  See Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66-67 (2001).

While the boundaries of Bivens-type liability are hazy, the Supreme Court, in its most recent term, made plain its reluctance to extend the Bivens doctrine to new settings.  See Hernandez v. Mesa, 137 S. Ct. 2003, 2006 (2017) (per curiam); Ziglar v. Abbasi, 137 S. Ct. 1843, 1857 (2017).  To this end, the Court specified that when a Bivens-type claim is lodged, the appropriate analysis must begin by determining whether the plaintiff is seeking to extend the Bivens doctrine to a new context.  See Abbasi, 137 S. Ct. at 1864.  For this purpose, a context is considered new "[i]f the case is different in a meaningful way from previous Bivens cases decided by [the Supreme] Court."  Id. at 1859.  Once it is determined that the context is new, the next step is to ask whether an alternative means of obtaining relief exists and, if so, whether "special factors" counsel hesitation in extending the reach of the Bivens doctrine.  Id. at 1865.

With respect to the Bivens doctrine, the universe of previous "cases decided by [the Supreme] Court," id. at 1859, is narrow.  Bivens itself arose in a context that bears no resemblance

to the workplace-based discrimination that lies at the heart of the plaintiffs' case.

Since deciding Bivens, the Court has recognized an implied right of action for constitutional torts in only two other contexts.  In the first of these cases, the Court held that the Due Process Clause of the Fifth Amendment permitted a damages action where a staffer sued a Member of Congress for cashiering her because of her gender.  See Davis v. Passman, 442 U.S. 228, 243-44 (1979).  Subsequently, the Court allowed a Bivens-type action under the Eighth Amendment in a case in which federal correctional officers had failed to treat a prisoner's asthma during his incarceration.  See Carlson v. Green, 446 U.S. 14, 20-23 (1980).

For the most part, Bivens and its progeny arose in contexts that differ meaningfully from the present context. Bivens involved the illegal search of an individual's home — an issue foreign to this case.[3]  So, too, this case — which is not concerned

---

[3] We note that González and Franco allege, as a tiny part of the parade of horribles that they muster, that their offices were illegally searched.  While this allegation may implicate the Fourth Amendment, it is inextricably intertwined with a myriad of more serious allegations, none of which brings the Fourth Amendment into play.  Given the Supreme Court's manifest reluctance to extend the Bivens doctrine, we do not think that the tail should be permitted to wag the dog.  This is all the more so where, as here, the federal-sector employment context meaningfully distinguishes the plaintiffs' case from Bivens.

either with the rights of prison inmates or with the strictures of the Eighth Amendment — differs meaningfully from Carlson.

This brings us to Davis, which arose in a context that bears a superficial similarity to the present context. That case, like this one, involves discrimination claims of federal employees. But even if we assume for argument's sake that the context is substantially the same, the plaintiffs hit a roadblock at the next step of the analysis, that is, whether there exists an alternative process that Congress reasonably may have viewed as an equally effective surrogate for an action brought directly under the Constitution. See Abbasi, 137 S. Ct. at 1858; Carlson, 446 U.S. at 18-19.

The linchpin of the Davis Court's analysis was its conclusion that Title VII, as then written, did not apply to congressional employees.[4] See Davis, 442 U.S. at 247. Here, no such exemption bars the gateway to relief: the plaintiffs — unlike the plaintiff in Davis — had available to them alternative processes (the CSRA and Title VII) that Congress reasonably might have viewed as effective substitutes for an action brought under the Constitution.[5] The existence of such alternative processes is

_____

[4] Title VII has since been extended to cover legislative employees. See 2 U.S.C. § 1302(a)(2).

[5] The CSRA was not enacted until 1978. See Pub. L. No. 95-454, 92 Stat. 1111 (1978). Consequently, it was unavailable to the Davis plaintiff and, in all events, it would not have applied

- 17 -

a special factor that counsels convincingly against applying the holding in Davis to federal employees generally.

Viewed against this backdrop, we conclude that the plaintiffs are seeking to extend the Bivens doctrine beyond acceptable limits. Federal-sector employment claims are sui generis: the CSRA and Title VII, with their regulatory accoutrements, form a comprehensive remedial network fully capable of protecting federal employees against acts of discrimination in the workplace. There is no justification for implying a Bivens-type remedy.

The plaintiffs dispute this conclusion. They argue that the statutory and regulatory mosaic does not afford as complete relief as a Bivens action and, thus, Congress might not have viewed those statutes and regulations as providing equally effective remediation. To illustrate this point, the plaintiffs note that they could not obtain punitive damages under either the CSRA or Title VII.[6] See Bush v. Lucas, 462 U.S. 367, 372 & n.8 (1983) (explaining that CSRA damages do not include punitive

_____

to a congressional staffer. See Davis v. Billington, 681 F.3d 377, 385-86 (D.C. Cir. 2012).

   [6] The plaintiffs also insist that their months-long suspensions are not covered under the CSRA. This insistence is misplaced. See 5 U.S.C. § 2302(a)(2)(A)(xii) (defining "personnel action" to include "any . . . significant change in duties, responsibilities, or working conditions," whether or not specifically denominated).

damages); 42 U.S.C. § 1981a(b)(1) (excluding government from punitive damages liability under Title VII).

This same argument was addressed and rejected by the Bush Court. See 462 U.S. at 372 & n.8. There, the Court considered whether the CSRA, together with other laws, precluded a federal employee's claim that he had been retaliated against for exercising his First Amendment rights. See id. at 385-86 & n.25. Assuming arguendo that greater damages would be available in a constitutional tort suit, the Court nonetheless held that the existing statutory regime precluded such a suit. See id.

The Bush Court couched its inquiry in a consideration of whether special factors existed that counselled hesitation in extending the Bivens remedy. See id. at 380. The Court determined that such factors were present, explaining that the "elaborate, comprehensive scheme that encompasses substantive provisions forbidding arbitrary action by supervisors and procedures — administrative and judicial — by which improper action may be redressed" militates against allowing the Bivens doctrine to intrude into the federal employment arena. 462 U.S. at 385; see Montplaisir v. Leighton, 875 F.2d 1, 3 (1st Cir. 1989) (noting that the Supreme Court "has jealously guarded [the] CSRA against inconcinnous judicial incursions").

The Bush Court's reasoning applies with undiminished force in the case at hand. The relevant "inquiry must concentrate

- 19 -

on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." Abbasi, 137 S. Ct. at 1857-58. In the context of this case, the careful layering of federal statutes, including the CSRA and Title VII, involves a wide range of policy considerations best left to Congress's superior understanding of governmental structures and systems nationwide. See id. at 1858; see also Bush, 462 U.S. at 389 ("Not only has Congress developed considerable familiarity with balancing governmental efficiency and the rights of employees, but it also may inform itself through factfinding procedures such as hearings that are not available to the courts.")

We conclude, therefore, that there is no basis for extending the Bivens doctrine to claims alleging arbitrary or discriminatory treatment in those precincts of the federal workplace patrolled by the CSRA and Title VII. The fact that other or different relief might be available to federal employees if constitutional tort suits were permitted does not alter this conclusion. The very purpose for which Congress enacted the CSRA was "to replace the haphazard arrangements for administrative and judicial review of personnel action" that characterized the preexisting civil service system. Fausto, 484 U.S. at 444. Engrafting new causes of action on an ad hoc basis would create a

patchwork that perpetuates the same infirmities that the CSRA was designed to avoid.

The plaintiffs also attempt to blaze a trail to relief by alleging RICO violations. The question of whether the CSRA and Title VII, taken together, preclude a civil RICO action brought by a federal employee against his coworkers and supervisors is one of first impression at the federal appellate level. Several district courts, though, have held that the CSRA precludes a civil RICO action in this context. See, e.g., Bloch v. Exec. Office of the President, 164 F. Supp. 3d 841, 857 (E.D. Va. 2016) (holding that "civil RICO claim[s] . . . alleging unlawful activity in connection with plaintiff's removal from federal employment" are precluded); Ferris v. Am. Fed'n of Gov't Emps., 98 F. Supp. 2d 64, 69 (D. Me. 2000) (holding that, in a federal-sector employment action, plaintiff "must seek redress . . . under the CSRA, not RICO").

These decisions are consistent with our case law, which has termed the CSRA framework "the exclusive mechanism for challenging adverse personnel actions in federal employment." Rodriguez, 852 F.3d at 82; see Berrios v. Dep't of the Army, 884 F.2d 28, 30 (1st Cir. 1989) ("There is no longer any serious dispute that the CSRA preempts challenges to personnel actions brought under federal law."). They also fit snuggly with the statutory text, which instructs that the CSRA "shall not be construed to extinguish or lessen" the rights and remedies

available under a list of enumerated statutes. 5 U.S.C. § 2302(d). RICO is not one of these enumerated statutes, and the venerable maxim inclusio unius est exclusio alterius applies. See Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 68 (1st Cir. 2002) (explaining that, "in harmony with the maxim . . . , the explicit provision of [one thing] within a statute cuts sharply against the implication of [others]").

Much the same reasoning pertains to the preclusive effect of Title VII vis-à-vis civil RICO actions. No less an authority than the Supreme Court has made pellucid that Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment." Brown, 425 U.S. at 835. "Exclusive" ordinarily means "exclusive," and we can envision no reason why a RICO claim premised on allegations of discrimination in federal employment might somehow elude the grasp of this congressionally declared exclusivity.

To sum up, we hold that the CSRA and Title VII, taken together, preclude the plaintiffs' constitutional tort claims. Similarly, we hold that the CSRA and Title VII, taken together, preclude the plaintiffs' RICO claims. Lastly, we hold that there are no other arguably non-precluded claims before us.[7] These

---

[7] We recognize that the third amended complaint is a stream-of-consciousness pleading, characterized more by prolixity than by clarity of expression. It may be possible for an inventive mind to tease arguably non-precluded claims out of its interstices. On

- 22 -

holdings, taken in cumulation, sound the death knell for the plaintiffs' appeal.

Two loose ends remain. First, the plaintiffs lament the length of time — roughly six and one-half years — that elapsed between the filing of the motion to dismiss and the district court's decision. They contend that this delay warrants vacating the judgment. This contention is hopeless.

Delay in the administration of justice is always regrettable. But there is no fixed time within which a district court must decide a dispositive motion, and delay alone is not a sufficient ground for vacating a civil judgment that, like this one, is correct on the merits. In such a situation, vacation of the judgment would be an empty exercise: on remand, the district court would simply re-enter its original judgment. Cf. Gibbs v. Buck, 307 U.S. 66, 78 (1939) (stating that it would be "useless" to reverse and remand where district court had corrected its error after an appeal was taken). We made it plain, long ago, that we will not force litigants "round and round the mulberry bush for no better reason than ceremonial punctiliousness." Jusino v. Zayas, 875 F.2d 986, 990 (1st Cir. 1989).

---

appeal, however, claims are deemed abandoned unless they are, at a minimum, accompanied by some developed argumentation. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). The plaintiffs' briefs contain nothing resembling developed argumentation with respect to any such arguably non-precluded claims.

Second, the plaintiffs fault the district court for failing to rule on their motion for summary judgment. Once the court granted the motion to dismiss and jettisoned the action, however, the plaintiffs' motion for summary judgment became moot. See McCulloch v. Vélez, 364 F.3d 1, 3-4 (1st Cir. 2004) (explaining that district court's allowance of motion to dismiss mooted pending motion for summary judgment). A court has no obligation — indeed, no authority — to adjudicate moot questions. See Barr v. Galvin, 626 F.3d 99, 104 (1st Cir. 2010). Seen in this light, the district court's decision to forgo any ruling on the summary judgment motion was both proper and logical.

## III. CONCLUSION

We need go no further.[8] For the reasons elucidated above, the judgment of the district court is

**Affirmed.**

---

[8] Because we hold that the CSRA and Title VII, taken together, preclude the plaintiffs' claims, we take no view of the welter of other defenses (such as absolute immunity, qualified immunity, and the like) relied on by the district court and advanced by various defendants.