# United States Court of Appeals
## For the First Circuit

No. 16-2256

GIOVANI DEPIANTI, and all others similarly situated,

Plaintiff, Appellant,

HYUN KI KIM, and all others similarly situated; KYU JIN ROH, and all others similarly situated; GERARDO VAZQUEZ, and all others similarly situated; GLORIA ROMAN, and all others similarly situated; JUAN AGUILAR, and all others similarly situated; NICOLE RHODES, and all others similarly situated; MATEO GARDUNO, and all others similarly situated; CHIARA HARRIS, and all others similarly situated; TODOR SINAPOV, and all others similarly situated; GRASIELLE REGINA DOS SANTOS,

Plaintiffs,

v.

JAN-PRO FRANCHISING INTERNATIONAL, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Thompson, Selya, and Barron,
Circuit Judges.

Shannon Erika Liss-Riordan, with whom Adelaide H. Pagano and Lichten & Liss-Riordan, P.C. were on brief, for appellant.
Jeffrey Mark Rosin, with whom Constangy, Brooks, Smith & Prophete, LLP was on brief, for appellee.

September 29, 2017

**THOMPSON**, **Circuit Judge**. Generation after generation of parents have passed along a basic adage to their children: if at first you don't succeed, try, try again. Such advice encouraging perseverance can serve one well throughout a myriad of life experiences. But while steadfast determination may, in the abstract, be worthy of aspiration, the legal field has--as is often the case--made an exception to this generalized rule.

Plaintiff Giovanni Depianti ("Depianti") appeals from the district court's grant of summary judgment to Defendant Jan-Pro Franchising International, Inc. ("Jan-Pro"). The lower court's ruling rested on principles of res judicata, concluding that the court was bound by a Georgia court judgment involving the exact same parties and the exact same issues. Because we agree that Depianti has already had his bite at the apple and is not entitled to yet another, we affirm.

## Getting Our Factual Bearings

We recite here only a brief synopsis of the factual background of this dispute, saving our energy, instead, for the necessary heavy lift that our discussion of this case's procedural history will require. Jan-Pro is a national company principally headquartered in Alpharetta, Georgia that organizes commercial cleaning franchises. Under its particular franchise model, Jan-Pro contracts with what are known as intermediary "master franchisees" or "master owners" (regional, third party entities)

to whom it sells exclusive rights to use the "Jan-Pro" logo, which is trademarked.  As of 2009 (which is the most up-to-date figure in the record), ninety-one different master owners existed.  These master owners, in turn, sell business plans to "unit franchisees." In other words, the business model set up by Jan-Pro is twofold, with (1) Jan-Pro acting as franchisor and the master owner acting as franchisee, in one instance and (2) the master owner acting as franchisor to the unit franchisee, in the other.

Jan-Pro and its master owners are separate corporate entities and each has its own staff.  Moreover, master owners may sell or transfer their individual businesses without approval from Jan-Pro.  Jan-Pro also reserves the right to inspect any premises serviced by either the master owner or any of the master owner's franchisees to ensure the Jan-Pro standards are being maintained. Still, master owners have their own entity names and internal business structures, and are responsible for their own marketing, accounting, and general operations.

As for master owners and their unit franchisees, under the terms of the model franchise agreement, master owners agree to provide their franchisees with an initial book of business, as well as start-up equipment and cleaning supplies.  Moreover, the master owner furnishes a training program for its unit franchisees. Once initial set-up and training is complete, the master owner agrees to (1) assist in the unit franchisee's customer relations

(by, for example, providing substitute employees or contractors to supply services in the event of an emergency impacting the unit franchisee); (2) provide the unit franchisee with invoicing and billing services; (3) advance the unit franchisee amounts that have been billed but not yet collected from customers; and (4) make available to the unit franchisee any improvement or changes in services or business methods that are made available to other franchisees. Additionally, the agreement notes that a unit franchisee is at all times an independent contractor solely in business for itself. As such, the unit franchisee may, for example, hire its own employees and decide what to pay them, as well as decide whether or not to pursue certain business opportunities.

One such master owner is Bradley Marketing Enterprises, Inc. ("BME"), which purchased master franchise rights from Jan-Pro in 2003 for a region covering parts of Massachusetts. In June 2003, Depianti signed a franchise agreement with BME at the level of "FP-100" (which is simply shorthand lingo for saying that Depianti was promised $100,000 in gross annual billings through his franchise relationship with BME). In order to enter into this agreement and obtain the unit franchise, Depianti was required to pay BME $23,400.

<u>**A Whirlwind Procedural Tour**</u>

Having given a very short overview of the lay of the land, we now embark on the more burdensome task of sketching out the nearly decade long life-cycle of this matter.

**A. The District of Massachusetts**

On April 18, 2008, Depianti brought suit against Jan-Pro alleging that his status as a unit franchisee of BME was a farce and that he was actually a direct employee of Jan-Pro.[1] He further maintained that due to this misclassification, he was denied certain employment benefits in violation of the Massachusetts Independent Contractor Law, Mass. Gen. Laws c. 149, § 148B ("Section 148B claim"). In particular, Depianti argued that the alleged misclassification resulted in the following: (1) unlawful deductions were taken from his pay; (2) he was forced to pay unnecessary expenses that ordinarily would have been borne by Jan-Pro (such as thousands of dollars in franchise fees); (3) he was not guaranteed minimum wage or overtime pay; and (4) he was ineligible for unemployment and workers' compensation.

---

[1] While we recognize that the original lawsuit in this case was brought on behalf of a putative class of cleaning workers that included Depianti, we note that Depianti is the only remaining plaintiff whose rights are at issue in this appeal. Thus, while many of the allegations in the complaint were lobbed against Jan-Pro by the putative class as a whole, our focus falls squarely on Depianti and our description of the history of this case is framed as such.

After discovery closed both sides moved for summary judgment as to the Section 148B Claim.[2] The district court was then tasked with applying Section 148B's three-prong test to the undisputed, material facts presented before it. Under that test, an individual performing a service is considered an employee unless:

> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
>
> (2) the service is performed outside the usual course of the business of the employer; and,
>
> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

Mass. Gen. Laws ch. 149, § 148B.[3]

The district court, however, encountered difficulties in properly applying the test. It expressed uncertainty as to how the multi-leveled franchise model employed by Jan-Pro would impact application of the three prongs. For example, the court noted that the relevant contract in the litigation was a franchise

---

[2] Jan-Pro also moved for summary judgment on numerous other claims that are not relevant to deciding this appeal.

[3] Given the remedial nature of the statute, the burden falls on the purported employer to prove all three prongs and, additionally, because the test is conjunctive, failure to satisfy any one prong necessarily warrants a finding that the worker in question--here, Depianti--is an employee. See Somers v. Converged Access, Inc., 454 Mass. 582, 589-90 (2009).

agreement between BME and Depianti--not one between Jan-Pro and Depianti--and that it had found no cases where a defendant was held liable under Section 148B without the named defendant being a party to the contract at issue. In light of the lack of developed Massachusetts state law or controlling state precedent on this issue, the court declined to rule one way or the other on the motions for summary judgment and, instead, issued an order explaining that it was "concerned that the [Massachusetts Supreme Judicial Court ("SJC")] has not yet been given an opportunity to decide legal questions that will likely have a substantial impact on the conduct of business throughout the Commonwealth." The court, therefore, explained that it was certifying the following question to the SJC: "[w]hether a defendant may be liable for employee misclassification under [Mass. Gen. Laws ch. 149, § 148B], where there was no contract for service between the plaintiff and defendant."[4] The district court then stayed the case pending a response by the SJC.

## B. Georgia State Court

At the same time the Massachusetts case was being litigated in the federal district court, a separate action initiated by Jan-Pro was making its way through the Georgia state-court system. As is relevant to this appeal, Jan-Pro had sought

---

[4] The district court also certified two other questions to the SJC that are not relevant to this appeal.

a declaratory judgment holding that no employment relationship between Jan-Pro and Depianti existed under Section 148B and that Jan-Pro was, therefore, not liable to Depianti in tort or contract. In the same case, Jan-Pro also sought a declaratory judgment against another unit franchisee, Hyun Ki Kim ("Kim") (the reason this seemingly extraneous fact is mentioned will become apparent later in our analysis).

At the early stages of the case, Depianti moved the Georgia superior court (the state's trial-level court) to dismiss the Georgia action for lack of personal jurisdiction. The superior court, however, refused to do so. On the contrary, the court concluded Depianti had not met his burden of demonstrating that he lacked the minimum contacts necessary to establish jurisdiction as required by the Georgia Long-Arm Statute. As such, the case proceeded to discovery.

Following the conclusion of discovery, both sides moved for summary judgment as to the Section 148B claim. In so doing, Depianti once again challenged whether the superior court had personal jurisdiction over him. The superior court concluded--as it did at the motion to dismiss stage--that it did properly possess personal jurisdiction. It also, however, favorably granted Depianti's motion for summary judgment--holding that Depianti was, indeed, an employee of Jan-Pro under Massachusetts law--and denied Jan-Pro's motion regarding the same. In the same order, the

superior court denied summary judgment as to Kim.  Concurrent with its summary-judgment order, the superior court also issued a certificate of immediate appealability regarding the question of personal jurisdiction.  The court explained that in light of "it appearing that said order denying [Depianti's jurisdiction motion] is not otherwise subject to direct appeal, I do hereby certify that said order is of such importance to the case that immediate review should be had."[5]

Depianti, however, made the choice not to appeal the superior court's personal-jurisdiction order.  Jan-Pro, on the other hand, did appeal the superior court's summary-judgment ruling in favor of Depianti to the Georgia Court of Appeals ("GCA") (an intermediate appellate court in Georgia).  Eventually, the GCA sided with Jan-Pro and reversed, concluding Jan-Pro had met its burden of proving all three prongs of Section 148B.  That is, the GCA concluded that Depianti was free from the control and direction of Jan-Pro; the cleaning services he performed were outside the usual course of Jan-Pro's business; and Depianti was engaged in an independently-established business (anyone interested in an in-depth recitation of the GCA's reasoning regarding each of the

---

[5] Such a certification was needed because the personal jurisdiction order was an interlocutory order not otherwise subject to immediate appeal.  See Ga. Code Ann. § 5-6-34(b) (explaining procedures for certification of an interlocutory appeal).

- 10 -

individual prongs can check out the GCA's decision at this citation: <u>Jan-Pro Franchising Int'l, Inc.</u> v. <u>Depianti</u>, 310 Ga. App. 265 (2011) ("<u>Depianti Georgia</u>")).

In light of this adverse ruling against Depianti, he filed a petition for writ of certiorari to the Georgia Supreme Court. The Georgia Supreme Court subsequently stayed its consideration of the petition pending the outcome of the SJC's answer to the question certified to it by the federal district court in Boston (as discussed earlier).

Thus, as it stands in our whirlwind tour of this matter's procedural history, both the federal district court for the District of Massachusetts and the Georgia Supreme Court had, at this point in time, entered stays pending the outcome of the SJC's answer.

## C. The Massachusetts Supreme Judicial Court Provides its Answer

Enter the SJC stage right with that desperately awaited-upon answer to the question certified. May a defendant be liable for employee misclassification under Section 148B even where there was no contract for service between the plaintiff and defendant? Yes, the SJC responded. <u>Depianti</u> v. <u>Jan-Pro Franchising International, Inc.</u>, 465 Mass. 607 (2013) ("<u>Depianti Answer</u>").[6]

---

[6] In so concluding, the SJC explained that "remedial statutes such as the independent contractor statute are 'entitled to liberal construction'" <u>Depianti Answer</u>, 465 Mass. at 620 (quoting <u>Batchelder</u> v. <u>Allied Stores Corp.</u>, 393 Mass. 819, 822 (1985)).

The SJC, however, declined to apply its holding directly to the relationship between Depianti and Jan-Pro. The question the district court certified was, in the words of the SJC, "limited" which the court understood "as asking only whether a contract between the parties is a necessary element of a claim under G.L. c. 149, § 148B." Id. at 619 (emphasis added). The SJC did not, in other words, interpret the certified question as asking for direct application of the elements of the statute to the particular franchise arrangement that existed between Jan-Pro, BME, and Depianti. Id. at 619 n.14. The SJC therefore warned that:

> [i]n concluding that an entity like Jan-Pro can be held liable under G.L. c. 149, § 148B, without a contract between itself and the employee, we should not be understood as suggesting that Jan-Pro is in fact liable. We take no position on the question whether the necessary predicates for liability can be established here, a matter involving determinations as to the summary judgment record that are solely within the purview of the United States District Court.

Id. at 623, n.16.

---

Indeed, "the purpose of the independent contractor statute is 'to protect workers by classifying them as employees, and thereby grant them the benefits of rights of employment, where the circumstances indicate that they are, in fact, employees.'" Id., 465 Mass. at 620 (quoting Taylor v. E. Connection Operating, Inc., 465 Mass. 191, 198 (2013)). To allow an end-run around the statute due simply to a company's use of a generalized, multi-tiered franchise structure, the court concluded, would "contravene the express purpose of the statute." Id., 465 Mass. at 624.

All the court decided was "that the lack of a contract for service between the putative employer and putative employee does not itself preclude liability" under Section 148B.  Id. at 624-25 (emphasis added).  No more, no less.

## D. The Aftermath

Less than a month after the SJC issued its answer to the district court's certified question, the Georgia Supreme Court lifted its stay and denied the petition for certiorari, noting that each of the justices concurred that the case was not worthy of review.  Jan-Pro then filed a notice of final judgment in the Massachusetts district court, explaining that in light of the Georgia Supreme Court's denial of certiorari, the GCA decision granting summary judgment in favor of Jan-Pro was final and should be honored for res judicata purposes.

Soon thereafter, both parties stipulated in the Georgia superior court to the dismissal of the Georgia action with prejudice and waived all rights to appeal.  As such, that case effectively ended.

Back in Massachusetts, the district court also lifted the stay and both parties filed supplemental summary-judgment briefs in light of the SJC decision.  Giving preclusive effect to the Georgia decision, the district court judge granted Jan-Pro's motion for summary judgment as to the Section 148B claim and denied Depianti's motion regarding the same.  Depianti, disagreeing with

the district judge's order, has appealed and so, at long last, here we are.

## Our Take

Depianti argues the district court erred in finding it was bound by the GCA's conclusion that he was not an employee of Jan-Pro for purposes of Section 148B. In particular, he contends that the GCA decision was not a final judgment and, therefore, the preclusive effect it would otherwise be given under res judicata principles did not attach. Jan-Pro, unsurprisingly, believes just the opposite--namely, that the district court properly applied res judicata and, as such, reached the only legally cognizable outcome in granting Jan-Pro's motion for summary judgment.

While we now step in to review de novo the district court's grant of summary judgment, see Bay State HMO Mgmt., Inc. v. Tingley Sys., Inc., 181 F.3d 174, 177 (1st Cir. 1999) ("The applicability of the doctrine of res judicata is a question of law subject to plenary review"), we first pause to provide a brief primer on the doctrine we conclude dictates the outcome of this case: res judicata.

### A. Primer

Res judicata, which provides that a final judgment on the merits of an action precludes the parties from relitigating claims that were or could have been raised in a prior action, Haag

- 14 -

v. <u>United States</u>, 589 F.3d 43, 45 (1st Cir. 2009), should be nothing new to litigants appearing before us. Indeed, its roots are almost as old as the Republic itself, deriving from the full faith and credit clause of the United States Constitution. <u>See</u> U.S. Const. art. IV, § 1 ("Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.").[7] So important, in fact, is this principle that it also has a statutory basis in the form of 28 U.S.C. § 1738, which reads in relevant part:

> The records and judicial proceedings of any court of any
> . . . State, Territory or Possession . . . shall have
> the same full faith and credit in every court within the
> United States and its Territories and Possessions as
> they have by law or usage in the courts of such State,
> Territory or Possession from which they are taken.

No surprise, then, that we have concluded that a federal court must give preclusive effect to a state-court judgment if the state court would. <u>Atwater</u> v. <u>Chester</u>, 730 F.3d 58, 62 n.3 (1st Cir. 2013).

And res judicata shouldn't be thought of as some hollow principle meant solely to be a thorn in the side of losing parties, either. To the contrary:

---

[7] For the sake of clarity, we note that we are specifically talking here about the preclusive effect of state court judgments. This is not to suggest that the entire doctrine of res judicata has no other roots. <u>See</u> <u>generally</u> Robert Wyness Millar, <u>The Premises of the Judgment as Res Judicata in Continental and Anglo-American Law: III. The Anglo-American Law</u>, 39 Mich. L. Rev 238 (1940) (tracing the historical origins of res judicata).

- 15 -

> Its enforcement is essential to the maintenance of social order; for the aid of judicial tribunals would not be invoked for the vindication of rights of person and property if, as between parties and their privies, conclusiveness did not attend the judgments of such tribunals . . . .

S. Pac. R.R. Co. v. United States, 168 U.S. 1, 49 (1897). Thus, because res judicata serves interests of great concern to the public--like finality, repose, and judicial economy--our judicial superiors remind us that fidelity to these core interests is frequently of greater importance than "any individual judge's ad hoc determination of the equities in a particular case." Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 401 (1981); see also Montana v. United States, 440 U.S. 147, 153 (1979) (explaining that res judicata is a "fundamental precept of common-law adjudication").

If "[t]he central role of adversary litigation in our society is to provide binding answers," 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4403 (3d ed.), then it is the doctrine of res judicata that necessarily preserves "judicial dispute resolution against the corrosive disrespect that would follow if the same matter were twice litigated to inconsistent results." Id. That is to say, res judicata is a protection afforded to the public, one safeguarding citizens from the anguish of being dragged through interminable litigation solely because an adversary has the will

or means to continue endlessly. Litigants--and the public-at-large--are entitled to trust that there will inevitably be an end-point to their judicial disputes. They are also entitled to trust judicial action and maintain faith in judicial results. Res judicata serves as a mechanism that ensures this trust remains intact.

## B. Application of Primer

With those res judicata principles in mind, we now turn to the heart of this matter. Because, as noted earlier, "a state court judgment is entitled to the same preclusive effect in federal court as it would be given in the state in which it was rendered[,]" García-Monagas v. De Arellano, 674 F.3d 45, 50 (1st Cir. 2012), and because the state court rendering the decision at issue here is in Georgia, we apply the same preclusion principles that courts in the Peach State would apply.

Georgia's doctrine of res judicata is codified at Ga. Code Ann. § 9-12-40, which provides:

> A judgment of a court of competent jurisdiction shall be conclusive between the same parties and their privies as to all matters put in issue or which under the rules of law might have been put in issue in the cause wherein the judgment was rendered until the judgment is reversed or set aside.

And, in order for the doctrine to apply in Georgia, "three prerequisites must be satisfied: (1) identity of the parties or their privies; (2) identity of the cause of action; and (3)

- 17 -

previous adjudication on the merits by a court of competent jurisdiction." Brown & Williamson Tobacco Corp. v. Gault, 280 Ga. 420, 421 (2006).

Depianti takes no issue with either the first or second prereqs. Depianti and Jan-Pro were the parties in both the Georgia and Massachusetts actions--satisfying prereq number one--and both actions were tasked with determining the type of relationship Depianti maintained with Jan-Pro (employee or independent contractor)--satisfying prereq number two. Instead, it is the last of the three prereqs--whether the judgment of the GCA was a final adjudication on the merits--that forms the crux of this dispute.

In Georgia, "final" means "a case in which a judgment . . . has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." Turpin v. Todd, 268 Ga. 820, 831 n.49, (1997) (quoting Griffith v. Kentucky, 479 U.S. 314, 321 n.6 (1987)). Here, given that the Georgia Supreme Court did, in fact, deny certiorari, it would appear as though the GCA's judgment was final for purposes of res judicata. But Depianti argues otherwise. He counters that while it is true the Georgia Supreme Court denied certiorari, the Georgia superior court never entered a subsequent final judgment following that denial. Without such explicit entry

of final judgment by the trial court, Depianti continues, no preclusive effect attached to the GCA's decision.

While Depianti doesn't cite to the legal source of his argument on this issue, his reasoning seems to be based on Ga. Code Ann. § 9-11-54(b). In relevant part that statute states:

> any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

In other words, if there are multiple claims in a case and a judgment is only rendered as to one of them, that judgment is "not a final judgment and lacks res judicata effect unless the trial court expressly directs the entry of a final judgment and determines that there is no just reason for delaying the finality of the judgment." Roth v. Gulf Atl. Media of Georgia, Inc., 244 Ga. App. 677, 679 (2000).

Here, the original action contained two discrete claims--one pertaining to Depianti and one pertaining to another unit franchisee, Hyun Ki Kim (we told you Kim would come back up). While the superior court granted Depianti's summary judgment motion, it denied summary judgment with regards to Kim. Thus, immediately following the adjudication of the summary judgment motions, the court's judgment as to Depianti was not at that time

- 19 -

final because the claim against Kim remained.  See id.  A Georgia statutory provision--Ga. Code Ann. § 9-11-56(h)--however, "allows but does not require an immediate appeal from the grant of summary judgment to one of the parties even though the judgment is not final. . . ."  Benedict v. Snead, 253 Ga. App. 749, 751 (2002). In other words, even though the court's grant of summary judgment in favor of Depianti was not itself final, Ga. Code Ann. § 9-11-56(h) provided Jan-Pro the right to file an immediate appeal of the decision (though Jan-Pro was in no way required to do so). Had Jan-Pro declined to pursue the appeal, then the remaining claim against Kim would have proceeded to trial and "the effect [would have been] that the grant of summary judgment as to [Depianti would] not [be] a final judgment during the pendency of the suit [because it would have been] 'subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.'"  Id. (quoting Ga. Code Ann. § 9-11-54(b)).  That is to say, had Jan-Pro chosen not to immediately appeal the court's grant of summary judgment to Depianti, then preclusive effect would not have attached to that particular decision until the rest of the case played out with Kim (and any subsequent appeals were resolved).

But that is not what happened here.  Instead, Jan-Pro did, in fact, choose to immediately appeal the Depianti summary-judgment decision.  In Georgia, where an immediate appeal of a

- 20 -

summary-judgment decision is undertaken pursuant to Ga. Code Ann. § 9-11-56(h) "then the appellate decision on the summary judgment ruling is binding" for purposes of res judicata under Ga. Code Ann. 9-11-60(h).[8] Roth, 244 Ga. App. at 679 (2000); see also Aiken Dermatology & Skin Cancer Clinic, P.A. v. DavLong Sys., Inc., 314 Ga. App. 699, 704 (2012) (same). In this particular scenario, then, res judicata took effect against Depianti even though the original lawsuit that resulted in the preclusive judgment against him had not yet concluded with regard to the other party, Kim. See Roth, 244 Ga. App. at 679. Upon the Georgia Supreme Court's denial of certiorari, then, (1) the GCA decision became final, (2) no express entry of final judgment by the superior court was necessary, and (3) preclusive effect attached.

To summarize, Depianti's argument that the Georgia judgment was not final because the superior court never crafted a declaratory judgment to close out the case is a failure. Once the GCA spoke and the Georgia Supreme Court denied certiorari, the shape of that declaration was foreordained. We have made plain,

---

[8] Ga. Code Ann. 9-11-60(h) states: "The law of the case rule is abolished; but generally judgments and orders shall not be set aside or modified without just cause and, in setting aside or otherwise modifying judgments and orders, the court shall consider whether rights have vested thereunder and whether or not innocent parties would be injured thereby; provided, however, that any ruling by the Supreme Court or the Court of Appeals in a case shall be binding in all subsequent proceedings in that case in the lower court and in the Supreme Court or the Court of Appeals as the case may be." (emphasis added).

long ago, that we will not force a litigant "round and round the mulberry bush for no better reason than ceremonial punctiliousness." González v. Vélez, 864 F.3d 45, 56 (1st Cir. 2017) (quoting Jusino v. Zayas, 875 F.2d 986, 990 (1st Cir. 1989)), and mandating that Jan-Pro get the superior court's stamp of approval on the final judgment of the GCA would do just that.

This could otherwise be the end of the case, but Depianti attempts to circumvent this unfavorable outcome by asserting a second argument: that the Georgia courts never had personal jurisdiction over him and, therefore, the GCA decision also cannot be considered final for that reason. "A motion to set aside a judgment based upon a lack of jurisdiction over the person may be brought at any time[,]" Swafford v. Elkins, 327 Ga. App. 802, 803 (2014), even at the conclusion of a case. Depianti argues that because he never forfeited the right to lodge an appeal on jurisdictional grounds, the final judgment of the GCA cannot truly be "final." Notwithstanding the fact that the GCA's decision was final for the reasons already discussed above, this alternative argument is also unavailing.

It is undisputed that Depianti challenged whether the Georgia superior court had jurisdiction over him at the motion to dismiss stage and again at summary judgment. It is also undisputed that the court determined both times that it properly possessed jurisdiction. In general, such interlocutory orders are not

appealable.  See, e.g., <u>Anthony</u> v. <u>Anthony</u>, 236 Ga. 508, 509 (1976).  But--and this should start to sound familiar--there is an exception to this generalized rule.  "The courts of Georgia and [our sister court, the 11th Circuit's] binding precedent interpreting Georgia law have clarified that when a trial judge certifies an interlocutory order for immediate appeal, the order becomes final for purposes of both appealability and preclusion." <u>Cmty. State Bank</u> v. <u>Strong</u>, 651 F.3d 1241, 1265–66 (11th Cir. 2011) (citing <u>Culwell</u> v. <u>Lomas & Nettleton Co.</u>, 242 Ga. 242, 243 (1978)). Here, the superior court did exactly that.  When it granted Depianti's motion for summary judgment on the Section 148B claim (and also rejected his assertion that no personal jurisdiction existed), the court simultaneously issued a certificate of immediate review as to the personal jurisdiction ruling.  That is, the court noted that the question of personal jurisdiction was of such importance to the case that Depianti should be afforded the opportunity to appeal its decision forthwith.  Depianti, however, chose not to appeal the personal jurisdiction issue, presumably because he had won on the substantive Section 148B claim.  And while that may have seemed like sound strategy at the time, strategic decisions have consequences.  Here, that decision to forego an appeal created res judicata effect.  See <u>id.</u> (quoting <u>Culwell</u>, 242 Ga. at 243) ("'[i]f the trial court does certify that the judgment is final and ripe for review under Code Ann. § 81A–

154(b) [now § 9-11-54(b)], the time for appeal begins to run,' creating 'res judicata effect.'").  The federal district court in Massachusetts, therefore, correctly concluded that it had no independent obligation to determine whether the Georgia courts had competent jurisdiction.  Rather, the district court was bound by the Georgia superior court's judgment that jurisdiction was proper.[9]

Finally, to the extent Depianti argues that the GCA got the decision wrong and that the logic it relied upon was overruled by the SJC in Depianti Answer, that argument fails.[10]  Whether or not Depianti Answer changed the lay of the land by substantially altering how Section 148B claims should be adjudicated, it is nonetheless "a well-settled principle that res judicata does not

---

[9] Additionally, we want to note here that Depianti's argument seems especially frivolous--bordering on disingenuous--in light of the fact that a joint stipulation of dismissal with prejudice was filed in the Georgia action that waived all rights of appeal. Depianti's position that he still could have appealed the personal jurisdiction issue seems nonsensical where (1) the superior court certified its jurisdiction order for immediate appealability; (2) Depianti chose not to appeal; and (3) Depianti subsequently waived all rights to appeal when the parties jointly dismissed the action.

[10] As a side note, Depianti's position that Depianti Answer created such a seismic shift in the law so as to fully undermine the GCA's decision is questionable.  The SJC merely concluded "that the lack of a contract for service between the putative employer and putative employee does not itself preclude liability" under Section 148B.  Depianti Answer, 465 Mass. at 624-25 (emphasis added).  While we express no view as to the correctness of the GCA decision, we note that the GCA included numerous other reasons for its ruling beyond the existence of Jan-Pro's multi-tiered franchise structure.  See generally Depianti Georgia, 310 Ga. App. 267-270.

- 24 -

allow dispensation for intervening changes in the law." <u>Haag</u>, 683
F.3d at 32 n.2 (1st Cir. 2012).  That is to say, "the res judicata
consequences of a final . . . judgment on the merits [are not]
altered by the fact that the judgment may have been wrong or rested
on a legal principle subsequently overruled in another case."
<u>Moitie</u>, 452 U.S. at 398.  Indeed, "if courts relaxed the principles
of claim preclusion every time it appeared that a litigant had a
strong claim 'on the equities,' the doctrine would fail to serve
its purposes of promoting judicial economy and repose."  <u>Rose</u> v.
<u>Town of Harwich</u>, 778 F.2d 77, 82 (1st Cir. 1985), <u>cert.</u> <u>denied</u>,
476 U.S. 1159 (1986).[11]  Any argument to the contrary, therefore,
is a nonstarter.

### Wrapping It Up

As attractive as it often is to resolutely pursue a
certain position--especially one so wholeheartedly believed in--
the more appropriate approach is sometimes to simply let sleeping
dogs lie--particularly where, as here, the law mandates it.

**Affirmed.**

---

[11] While both parties briefed the issue, we need not venture
into the murky world of whether the GCA correctly applied Section
148B's test in concluding Depianti was not an employee of Jan-Pro.
Because res judicata dictates the outcome here, no more is needed.