# United States Court of Appeals
## For the First Circuit

No. 23-1618

ROBERT ARIAS,

Plaintiff, Appellant,

v.

NOAH A. HERZON, JUAN INFANTE, TY KURCHARSKI, CHRISTOPHER DAY,
ADALBERTO GARCIA, MICHAEL BERNARD,

Defendants, Appellees,

US GOVERNMENT, US DRUG ENFORCEMENT ADMINISTRATION,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya B. McCafferty, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Thompson, Circuit Judges.

Jeremy D. Eggleton, with whom Orr & Reno, P.A., was on brief,
for appellant.

Terry L. Ollila, Assistant United States Attorney, with whom
Jane E. Young, United States Attorney, was on brief, for appellees.

August 15, 2025

**BARRON**, <u>Chief Judge</u>.  More than a half a century ago, in <u>Bivens</u> v. <u>Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), the Supreme Court of the United States recognized an implied cause of action for damages against a federal law enforcement officer for violating an individual's Fourth Amendment rights.  Is that remedy still available?  The U.S. District Court for the District of New Hampshire held that it is not.  This appeal requires us to decide whether that is right.

The District Court based its ruling on a 1988 amendment to the Inspector General Act (IGA) that established an administrative mechanism for lodging misconduct complaints against federal law enforcement officers with the U.S. Department of Justice's Office of the Inspector General.[1]  The District Court concluded that, because of that legislative development, the Fourth Amendment claims in this case arise in a new context compared to <u>Bivens</u>.  The District Court went on to conclude that the IGA's "alternative remedial scheme" counseled against extending the <u>Bivens</u> remedy to that new context.  And, on that basis, it held that the defendants -- U.S. Drug Enforcement Agency (DEA) agents -- were entitled to summary judgment on the Fourth

---

[1] The District Court stated that Congress created this remedy through enacting the Inspector General Act of 1978, but Congress did not extend that statute's provisions to the Department of Justice until 1988.  <u>Compare</u> Inspector General Act of 1978, Pub. L. No. 95-452, 92 Stat. 1101 (1978), <u>with</u> Inspector General Act Amendments of 1988, Pub. L. No. 100-504, 102 Stat. 2515 (1988).

Amendment claims that the plaintiff -- Robert Arias -- brought against them for excessive force and a failure to intervene to prevent the use of that force.

We do not agree that Congress's more than three-decades-old amendment to the IGA in and of itself makes the context in which Arias's claims arise new compared to Bivens. Thus, because we conclude that, the IGA aside, Arias's excessive force claims arise in the same context as Bivens, the Bivens remedy is available here just as it was there. Indeed, were we to conclude otherwise, we would have to conclude, incongruously, that the Bivens remedy has been a dead letter since the IGA's amendment, even though the Supreme Court has reaffirmed the existence of that remedy in the years after that now decades-old legislative development.

Accordingly, we reverse the District Court's grant of summary judgment to the defendants on Arias's excessive force claims. However, we affirm the grant of summary judgment to the defendants on his failure-to-intervene claims. We do so because Arias fails to explain why, notwithstanding the distinct nature of the misconduct that those claims allege, they arise in the same context as Bivens. Nor does he explain why, insofar as those claims do arise in a new context, the Bivens remedy should be extended to it.

In 2017, Arias brought a suit for damages in the District of New Hampshire against federal DEA agents. He sought the damages for the physical and emotional harms allegedly caused by his September 2016 arrest, which was undertaken pursuant to a warrant and in a shopping center parking lot. He based the claims on the implied cause of action for damages under the Fourth Amendment that the Supreme Court recognized in Bivens. His complaint alleges that some of the defendants violated his Fourth Amendment rights through their use of excessive force, and that the others violated his Fourth Amendment rights by failing to intervene to prevent that excessive use of force.

The defendants moved for summary judgment based on what was then the Supreme Court's most recent decision in the Bivens line, Egbert v. Boule, 596 U.S. 482 (2022). They argued that, under Egbert, Arias could not assert the implied cause of action for damages that Bivens recognized as to any of his claims.

In Egbert, the Court described a two-step framework for assessing when a Bivens remedy is available. Id. at 492. At the first step, a court must determine whether the plaintiff's claims arise in a "new context" compared to one of the cases in which the Court already has recognized a damages remedy under Bivens. Id. If the context is not new, then the inquiry ends and the Bivens remedy may be asserted. Id.; Quinones-Pimentel v. Cannon, 85 F.4th

- 5 -

63, 70 (1st Cir. 2023). If the context is new, then a court must move on to the second step. Egbert, 596 U.S. at 492. There, it must determine whether there are "special factors counselling hesitation" in extending the Bivens remedy to that new context. Ziglar v. Abbasi, 582 U.S. 120, 136 (2017); see Egbert, 596 U.S. at 492. If the court concludes that there is such a factor, then it must conclude that the Bivens remedy is not available. Egbert, 596 U.S. at 492.

As to the first step, the defendants argued that Arias's claims arise in a new context because, unlike the alleged misconduct in Bivens itself, the misconduct that he alleged: (1) was undertaken pursuant to a warrant, (2) occurred in a publicly accessible parking lot, and (3) included a claim based on a failure to intervene to prevent the excessive use of force. As to the second step, the defendants argued that there are "special factors counseling hesitation" that preclude extending the Bivens remedy to that new context. They pointed to both the IGA's administrative remedy and the availability of damages against the United States under the post-Bivens amendments to the Federal Tort Claims Act (FTCA).

The District Court granted the defendants' summary judgment motion. It considered Arias's excessive force claims separately from his failure-to-intervene claims.

- 6 -

The District Court observed that Arias's excessive force claims "share[d] many of the same background facts" with Bivens: "an arrest made by federal narcotics agents investigating a violation of federal drug laws that would have been routine but for the alleged constitutional violations." It also recognized that Arias's excessive force claims named the same category of defendants as the claims in Bivens, even though Bivens involved claims against agents from the Federal Bureau of Narcotics. The functions of that agency, the District Court noted, had been transferred to the DEA by the time that the excessive force allegedly occurred. The District Court observed, too, that Arias's excessive force claims alleged a violation of the same constitutional right as the claims in Bivens, as the claims in that case also alleged a violation of the Fourth Amendment right against the use of excessive force.

In addition, the District Court expressly rejected the defendants' assertions that Arias's excessive force claims arise in a new context because the allegedly excessive force occurred during an arrest that had been effectuated pursuant to a warrant and in a shopping center parking lot. The District Court reasoned that, although the search and arrest in Bivens were alleged to have been carried out without a warrant and at the plaintiff's home, those distinctions were not meaningful, and that "[a]t

bottom" Arias's case "presents with facts virtually indistinguishable from Bivens."

Nonetheless, the District Court determined that the similarities between Arias's excessive force claims and the claims in Bivens did not necessarily show that the context was the same in the two cases. Rather, the District Court determined, based on its understanding of Egbert and without the defendants having so argued, that it also had to address a distinct possible basis for Arias's excessive force claims arising in a new context compared to Bivens -- namely, the availability under the IGA of an administrative remedy.

The District Court observed that, under the IGA and 28 C.F.R. § 0.29c(c), Arias could file a misconduct report about the defendants' conduct with the U.S. Department of Justice's Office of the Inspector General and have his allegations investigated and remedied administratively. By contrast, the District Court noted, the plaintiff in Bivens did not have available to him that same legislatively established means of administratively addressing the misconduct that he alleged.

The District Court went on to determine that, under Egbert, "the existence of the alternative remedial scheme is enough to both place the case into a new context at the first step and to prohibit expanding Bivens at the second step." The District Court therefore determined that Arias could not assert an implied cause

of action for damages under the Fourth Amendment as to his excessive force claims. And it did so despite its conclusion that -- setting the IGA aside -- those claims arise in the same context as in Bivens itself.

The District Court further concluded that the presence of the IGA's scheme is a special factor counseling hesitation in extending the Bivens remedy to a new context. And, finally, the District Court concluded that, because this remedial scheme is itself "sufficient to require dismissal," there was no need to decide whether the damages remedy against the United States that, post-Bivens, the FTCA makes available to recover for uses of excessive force by federal law enforcement officers "might also foreclose Arias's Bivens claims."

The District Court next turned to Arias's failure-to-intervene claims. With respect to the first step of the analytical framework that Egbert described, the District Court explained that "[r]egardless of whether a failure-to-intervene claim is an alternative theory of liability or separate constitutional violation, Bivens did not involve any theory that the defendant officers' failure to intervene should subject them to bystander liability." In the District Court's view, therefore, Arias's failure-to-intervene claims arise in a new context compared to Bivens. The District Court then explained that, as with Arias's excessive force claims, "the existence of an

- 9 -

alternative remedial scheme [in the form of the IGA] [wa]s sufficient to place the case in a new context and foreclose [Arias's] Bivens claim."

Accordingly, the District Court granted summary judgment to the defendants on Arias's claims. Arias timely appealed.

## II.

We start with Arias's challenge to the grant of summary judgment to the defendants on his excessive force claims. Arias contends that, the IGA aside, the District Court was right to treat the claims as arising in the same context as Bivens. But he contends that the District Court erred in ruling that, because of the IGA, the claims necessarily arise in a new context compared to Bivens. He thus argues that the District Court erred in granting the defendants summary judgment on the claims. We agree.

To explain why, we first describe the analytical framework for determining whether a Bivens remedy is available and how its two steps, though distinct, relate to one another. We then address how that framework applies to Arias's excessive force claims.

## A.

"In Bivens, the Court held that a Fourth Amendment violation by federal agents, acting under color of governmental authority, gave rise to a cause of action for money damages against those agents in their individual capacities." González v. Vélez,

864 F.3d 45, 52 (1st Cir. 2017).  The Court thereafter recognized implied causes of action for damages under the Constitution against federal officers in two other contexts.

First, in Davis v. Passman, the Court recognized a damages action under the Fifth Amendment that permitted a former congressional staffer to bring a sex discrimination claim against a Congressperson.  442 U.S. 228 (1979).  Second, during the very next Term, in Carlson v. Green, the Court recognized a damages action under the Eighth Amendment against federal prison officials for the inadequate medical treatment of a prisoner.  446 U.S. 14 (1980).

Since Carlson, however, the Court has made clear that it is skeptical that there can be implied causes of action.  "Now long past 'the heady days in which th[e] Court assumed common-law powers to create causes of action,'" the Court has explained, it has "come 'to appreciate more fully the tension between' judicially created causes of action and 'the Constitution's separation of legislative and judicial power.'"  Egbert, 596 U.S. at 491 (first quoting Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 75 (2001) (Scalia, J., concurring); and then quoting Hernandez v. Mesa, 589 U.S. 93, 100 (2020)).

"At bottom," the Court has reasoned, "creating a cause of action is a legislative endeavor."  Id.  It even has gone so far as to question whether, under this newer view of implied causes

of action, it would have decided <u>Bivens</u>, <u>Davis</u>, or <u>Carlson</u> the same way. <u>Id.</u> at 502; <u>Abbasi</u>, 582 U.S. at 134.

Nonetheless, "[r]ather than dispense with <u>Bivens</u> altogether," <u>Egbert</u>, 596 U.S. at 491, the Court merely has "made clear that <u>expanding</u> the <u>Bivens</u> remedy is now a 'disfavored' judicial activity." <u>Abbasi</u>, 582 U.S. at 135 (emphasis added) (quoting <u>Ashcroft</u> v. <u>Iqbal</u>, 556 U.S. 662, 675 (2009)). Thus, the Court has counseled that the "watchword is caution" when a plaintiff's claim would require an extension of one of the implied causes of action the <u>Bivens</u> line already recognizes. <u>Egbert</u>, 596 U.S. at 491 (quoting <u>Hernandez</u>, 589 U.S. at 101). And, based on that "reluctan[ce] to create <u>new</u> causes of action," the Court has consistently denied requests to <u>extend</u> the remedy recognized in <u>Bivens</u>, <u>Davis</u>, or <u>Carlson</u>. <u>Hernandez</u>, 589 U.S. at 101-02 (emphasis added).

At the same time, the Court has been careful to state that <u>Bivens</u> itself is still good law. It therefore has made clear that the cause of action recognized there remains available. <u>See</u> <u>Abbasi</u>, 582 U.S. at 134 ("The settled law of <u>Bivens</u> in th[e] common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere."); <u>Egbert</u>, 596 U.S. at 502 (declining to overrule <u>Bivens</u>). Indeed, in the wake of the Court's invocation of law enforcement's reliance on the "fixed principle" <u>Bivens</u>

established, Abbasi, 582 U.S. at 134, courts have continued to permit damages actions brought under Bivens. See, e.g., Snowden v. Henning, 72 F.4th 237, 243-44 (7th Cir. 2023), cert. denied, 145 S. Ct. 137 (2024); Hicks v. Ferreyra, 64 F.4th 156, 166 (4th Cir. 2023), cert. denied, 144 S. Ct. 555 (2024). Consistent with that view, we have repeatedly acknowledged that the Bivens remedy continues to exist. See DeMayo v. Nugent, 517 F.3d 11, 15 (1st Cir. 2008) ("An individual may vindicate a proven violation of his or her right to be free from unreasonable searches through a Bivens action."); Quinones-Pimentel, 85 F.4th at 70 (explaining that "[if] the case presents . . . no new context[,] . . . relief under Bivens is available").

Accordingly, it is doubtful that a plaintiff may seek damages under the Fourth Amendment against federal law enforcement officers under a cause of action that a court would have to create. But a plaintiff may do so pursuant to the cause of action that the Court recognized in Bivens.[2]

---

[2] We do not understand Egbert to suggest otherwise in stating that "recognizing a cause of action under Bivens is 'a disfavored judicial activity,'" Egbert v. Boule, 596 U.S. 482, 491 (2022) (emphasis added) (quoting Ziglar v. Abbasi, 582 U.S. 120, 135 (2017)), given that in Abbasi and Hernandez, the Court emphasized that "expanding the Bivens remedy" was judicially disfavored. Abbasi, 582 U.S. at 135 (emphasis added); Hernandez, 589 U.S. at 101 ("We have stated that expansion of Bivens is a 'disfavored judicial activity.'" (cleaned up) (quoting Abbasi, 582 U.S. at 135)); see also Egbert, 596 U.S. at 491 (referring multiple times in the same paragraph to "creating" a damages remedy).

The first step of the two-step framework that Egbert describes follows from the Court's decision to affirm the cause of action that Bivens recognized, see Abbasi, 582 U.S. at 134 ("Bivens does vindicate the Constitution by allowing some redress for injuries . . . ."), but caution against the creation of any new ones. At that step, as we noted at the outset, a court must determine whether the plaintiff, in seeking damages under the Bivens line, is requesting the creation of a new cause of action or is merely asserting a cause of action that the Court already has recognized.

How, then, is a court supposed to make that determination? The answer turns on whether the plaintiff's claim "presents 'a new Bivens context.'" Egbert, 596 U.S. at 492 (quoting Abbasi, 582 U.S. at 139).

The Supreme Court has made clear that the plaintiff's damages action arises in a new context if the case is "'meaningful[ly]' different from the three cases in which the Court has implied a damages action." Id. (alteration in original) (emphasis added) (quoting Abbasi, 582 U.S. at 139). Consistent with this focus, the Court has emphasized that "[s]ome differences, of course, will be so trivial that they will not suffice to create a new Bivens context." Abbasi, 582 U.S. at 149 (emphasis added). And we agree with the Seventh Circuit that the Supreme Court's

requirement "[t]hat a difference must be 'meaningful' suggests that some degree of variation will not preclude a Bivens remedy." Snowden, 72 F.4th at 243-44.

In other words, it is most doubtful that Bivens, Davis, and Carlson are tickets that may be used to reach a stop that is not already on the existing Bivens line of authority. But those tickets are not good only for those same three stops. They also may be used for additional stops on the same line that Bivens, Davis, and Carlson define.

What, then, makes a difference "meaningful," such that -- again at this first step of the analysis -- the context is "new"? The answer to that question is "a bit unclear," Quinones-Pimentel, 85 F.4th at 69, as the Supreme Court has not provided an exhaustive accounting.

The Court has explained, however, that:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider.

Abbasi, 582 U.S. at 139-40 (emphasis added). It also has made clear that when a case "involves a 'new category of defendants,'"

that _is_ a meaningful difference which renders the context new. _Egbert_, 596 U.S. at 492 (quoting _Malesko_, 534 U.S. at 68).

We agree with the Seventh Circuit that, in the end, the inquiry is a functional one. As it has explained, "the Court's evolving _Bivens_ guidance . . . suggest[s] that a difference is 'meaningful' if it might alter the policy balance that initially justified the causes of action recognized in _Bivens_, _Davis_, and _Carlson_." _Snowden_, 72 F.4th at 244. Thus, it has explained that "[i]f a case involves facts or legal issues that would require _reweighing_ the costs and benefits of a damages remedy against federal officials, then the difference is 'meaningful' because we risk further encroachment on the legislative function rather than simply applying controlling Supreme Court precedent." _Id._ (emphasis added). It follows that if a case does not involve facts or legal issues that would require such a reweighing, then the difference does not in and of itself make the context new.

This functional approach accords with the fact that it is only when a case presents a new context that we must proceed to the second step of the analysis and ask whether "there are any 'special factors' counseling against _extending_ _Bivens_" to that new context. _Quinones-Pimentel_, 85 F.4th at 70 (emphasis added) (quoting _Egbert_, 596 U.S. at 492). That question need not be asked if the context is one in which the Supreme Court already has performed the required "[]weighing" in recognizing -- and then

- 16 -

reaffirming -- the implied causes of action in Bivens, Davis, or Carlson. Snowden, 72 F.4th at 244. In a context of that sort, the Court already has asked and answered whether there is any "indicat[ion] that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" Egbert, 596 U.S. at 492 (quoting Abbasi, 582 U.S. at 136). And, as a lower court, we may not second-guess that determination once the Court has made it, which is why we have explained that "[i]f the case presents no meaningful differences (and thus no new context), the analysis ends there and relief under Bivens is available."[3] Quinones-Pimentel, 85 F.4th at 70 (emphasis added).

---

[3] At oral argument, the defendants argued based on González v. Vélez, 864 F.3d 45 (1st Cir. 2017), that we could reach step two of the Bivens inquiry even if the case did not present a new context. They apparently rested that contention on our statement in that case that "even if we assume[d] for argument's sake that the context [was] substantially the same, the plaintiffs [would] hit a roadblock at the next step of the analysis" regarding alternative remedies. Id. at 53. But the plaintiffs there were attempting to use the cause of action recognized in Davis v. Passman, 442 U.S. 228 (1979), to raise a claim that "b[ore]" only a "superficial similarity" to Davis itself. González, 864 F.3d at 53. In assuming that the claims arose in "substantially the same context," we were merely assuming that they were "substantially" similar enough to warrant comparison to Davis in the first place -- not that the contexts were, in fact, the same. Thus, we proceeded to the second step of the analysis only because it was clear that the context was new. See id. at 52 (explaining that the second step alternative remedies inquiry applies only "[o]nce it is determined that the context is new").

- 17 -

## c.

All that said, Egbert does note that the two-step analysis may in some cases present only a single question. Egbert, 596 U.S. at 492 ("While our cases describe two steps, those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy."). The very factor that may make a context new may be the "special factor counseling hesitation" in extending the cause of action. See id. ("[W]e have identified several examples of new contexts -- e.g., a case that involves a 'new category of defendants,' -- largely because they represent situations in which a court is not undoubtedly better positioned than Congress to create a damages action." (quoting Malesko, 534 U.S. at 68)); cf. Snowden, 72 F.4th at 243 n.3 ("[S]ometimes the Court's cases do not explicitly address the 'new context' inquiry because they do not need to -- where, for example, the case raises a claim under a different constitutional provision (like the First Amendment) or presents an obviously distinct factual setting (like the military)."). Relatedly, the special factor that counsels against extending the Bivens remedy to a new context also may be a factor that in and of itself makes the context new. In other words, in some cases the same factor may do double duty. Importantly, however, the Court was careful to observe that the two-step inquiry

"often" will reduce to a single question, Egbert, 596 U.S. at 492 (emphasis added), rather than that it always does so.

**III.**

We are now well situated to address the excessive force claims under the first step of the analysis described in Egbert. With respect to that step, Arias emphasizes that, like the plaintiff in Bivens, his excessive force claims seek damages under the Fourth Amendment for "unreasonable force . . . employed in making [his] arrest." Bivens, 403 U.S. at 389. He also emphasizes that, like the plaintiff in Bivens, he names line law enforcement officers as defendants in those claims.

Arias acknowledges that the defendants here were employed by the DEA at the time of the alleged misconduct, while the defendants in Bivens were employed by the Federal Bureau of Narcotics. He contends that this difference is not meaningful, though, because the DEA is the successor to that now-defunct agency. See United States v. Feola, 420 U.S. 671, 684 n.18 (1975).

Arias also points out that the "judicial guidance" as to what constitutes excessive force under the Fourth Amendment is at least as clear now as it was at the time of Bivens. See Abbasi, 582 U.S. at 140; see also Graham v. Connor, 490 U.S. 386, 395-97 (1989) (outlining the relevant inquiry); Cnty. of Los Angeles v. Mendez, 581 U.S. 420, 427 (2017) (noting that the "case law sets forth a settled and exclusive framework for analyzing whether the

force used in making a seizure complies with the Fourth Amendment"); Lachance v. Town of Charlton, 990 F.3d 14, 20 (1st Cir. 2021); O'Brien v. Town of Bellingham, 943 F.3d 514, 530-31 (1st Cir. 2019). So, again, he argues, his excessive force claims do not arise in a new context.

Of course, "even a modest extension is still an extension." Abbasi, 582 U.S. at 147. Thus, despite the many parallels between Arias's excessive force claims and the claims in Bivens, we must remain alert for any "meaningfully new factual circumstances." Quinones-Pimentel, 85 F.4th at 70.

The defendants highlight three factual circumstances that they argue -- either when taken together or considered on their own -- render the context here new. See id. at 72 n.6 (concluding that multiple "differences, collectively, [can] distinguish [a] case meaningfully from Bivens"). The three circumstances are: the presence of a warrant, the public location of the arrest, and the presence of a post-Bivens alternative remedy via the IGA.[4]

We start with the first two circumstances even though the District Court relied solely on the third in finding the

_____

[4] The defendants also contend that Arias's "inclusion of a failure-to-intervene claim" counts among the "factors" that place his case into a new context. But they identify no support for the notion that this separate claim could bear on whether Arias's excessive force claims present a new context. So, we analyze whether that claim presents a new context in Part IV.

- 20 -

context here new.  Reviewing de novo, Quinones-Pimentel, 85 F.4th at 68, we are not persuaded that either one of these two circumstances shows that Arias's excessive force claims arise in a new context.  We then consider the third circumstance -- the presence of the IGA's administrative remedy.  Reviewing de novo, id., we conclude that this circumstance also fails to make the context new.

### A.

As to their possession of a warrant, the defendants direct our attention to Abbasi.  The Court explained there that a "case might differ in a meaningful way because of . . . the statutory or other legal mandate under which the officer was operating."  Abbasi, 582 U.S. at 139-40.  The defendants point out that, when assessing the reasonableness of a use of force, courts must consider, among other factors, the severity of the crime.  See Graham, 490 U.S. at 396.  They go on to contend that, when a warrant is issued, the severity of the crime depends "not solely on the judgment of the officer on the scene, but on the probable cause determination of a neutral and detached magistrate."  They therefore contend that we must conclude that law enforcement officers who use force while acting pursuant to a warrant operate under a different legal mandate than do law enforcement officers who use such force while not acting pursuant to a warrant.  And so, the defendants argue, because the officers in Bivens did not

have a warrant, Bivens, 403 U.S. at 389, the officers here were operating under a different legal mandate.

We are not convinced. Arias alleges that the defendants violated his Fourth Amendment rights by using excessive force -- not by conducting an unreasonable search or merely effecting an unlawful seizure. While "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," Graham, 490 U.S. at 396, it plainly does not provide a "legal mandate" to use excessive force, see Abbasi, 582 U.S. at 139-40.

That an arrest warrant requires a "neutral and detached magistrate" to determine probable cause also does not show that the officers here were operating under a different legal mandate. The judicial determination to grant an arrest warrant was not a determination that excessive force may be used to execute that warrant or, quite obviously, that the force in fact used was not excessive. Nor was that judicial determination an assessment of the severity of the crime to which the warrant pertains. It was an assessment of whether there was a sufficient basis for an arrest, not of the underlying crime's severity.

That Congress could think that an arrest with a warrant differs from an arrest without one is therefore of little relevance here. The use of excessive force in effectuating an arrest is equally excessive regardless of whether an arrest is made pursuant

to a warrant. We thus do not see how the presence of a warrant here constitutes a meaningful difference from Bivens, given the nature of the claims at issue. That is especially so because nothing in Bivens appears to have turned on the officers not having a warrant when using the allegedly excessive force. See generally Bivens, 403 U.S. 388. Nor are we alone in so holding. See Snowden, 72 F.4th at 247; Logsdon v. U.S. Marshal Serv., 91 F.4th 1352, 1357 (10th Cir. 2024).

The cases relied on by the defendants -- and the dissent -- do not persuade us otherwise. Those cases involved claims targeting unreasonable searches and other factors that clearly gave rise to a new context compared to Bivens. See Cain v. Rinehart, No. 22-1893, 2023 WL 6439438, at *3-4 (6th Cir. July 25, 2023) (unreasonable search and new category of defendant); Quinones-Pimentel, 85 F.4th at 72 (same); Annappareddy v. Pascale, 996 F.3d 120, 135-36 (4th Cir. 2021) (same, along with a different injury).

Cienciva v. Brozowski, No. 3:20-CV-2045, 2022 WL 2791752 (M.D. Pa. July 15, 2022), which the defendants also cite, did conclude that the presence of a warrant is a meaningful difference that places an excessive force claim into a new context. Id. at *9-11. The claim there, however, also involved a new category of defendant, which would squarely place the case into a new context. Id.; see Egbert, 596 U.S. at 492. But, although the district court

- 23 -

in that case did not deem the context new on that basis, we do not find the reasoning in Cienciva convincing -- for all the reasons we already have given -- insofar as the district court concluded that the warrant on its own made the context for an excessive force claim new.

The dissent, for its part, invokes Cantú v. Moody, 933 F.3d 414, 423 (5th Cir. 2019), to show that the Fifth Circuit has "held that the existence of a warrant amounts to a meaningful difference from Bivens." But that case did not involve an argument that the presence of a warrant independently rendered the context new. Nor did the Fifth Circuit hold there what the dissent asserts that it held. It merely observed that the "claim [in that case] involve[d] different conduct" than in Bivens because the claim was premised on the allegation that the defendant "falsified affidavits" rather than that "the officers entered his home without a warrant or violated his rights of privacy." Id. The Fifth Circuit thus concluded that the context was new because the extent of judicial guidance "differs across the various kinds of Fourth Amendment violations" and the plaintiff's claims involved "different officers from a different agency." Id.

So, while our dissenting colleague accuses us of creating a circuit split, the dissent would hardly avoid one. Under the approach that the dissent favors, our circuit would be directly at odds with the Seventh and Tenth Circuits.

**B.**

As to the excessive force having allegedly occurred here in a publicly accessible parking lot, it is true that the alleged misconduct in Bivens occurred at a private home. It is also true that the place where an alleged Fourth Amendment violation occurs can be a meaningful difference. See Hernandez, 589 U.S. at 103. But the location where the misconduct occurred here -- the parking lot of a privately owned shopping center -- does not trigger the kind of acute separation of powers concerns that made the "cross-border" context at issue in Hernandez meaningfully different from the context of Bivens itself. Id.

Moreover, the fact that the allegedly excessive force took place in a parking lot rather than at a private home does not risk "alter[ing] the policy balance that initially justified the cause[] of action recognized in Bivens" as "a separation-of-powers matter." Snowden, 72 F.4th at 244, 247. As the Seventh Circuit well put it in considering a claim of excessive force that allegedly occurred in the lobby of a hotel, "[h]otel or home, warrant or no warrant -- the claims here and in Bivens stem from run-of-the-mill allegations of excessive force during an arrest." Id. at 247; see also id. (distinguishing the excessive force claim from one that allegedly occurred "in a government facility").

We also do not see how the location, when combined with the fact that the arrest is alleged to have been made pursuant to

a warrant, makes the context here meaningfully different from the context in Bivens. Nor do the defendants explain why, when these two features are considered together, their interaction would require a different conclusion than when either is considered alone.

The dissent does correctly note that in Byrd v. Lamb, 990 F.3d 879, 882 (5th Cir. 2021), the Fifth Circuit concluded that the fact that the "case arose in a parking lot, not a private home as was the case in Bivens," was a meaningful difference. But because the Fifth Circuit provided no explanation for why that difference would be meaningful, we do not find its decision persuasive.

The dissent cites Mejia v. Miller, 61 F.4th 663, 668 (9th Cir. 2023), for the proposition that "challenged conduct outside the home amounts to a meaningful difference from Bivens." The challenged conduct there, however, was alleged to have "occurred on public lands managed by" a new category of defendants -- officers from the Bureau of Land Management -- who were also operating under a different legal mandate. Id. So, the public location of that violation -- unlike the location at issue in the case before us -- does appear to have raised separation of powers concerns of the kind that the Supreme Court has suggested are meaningful.

Once again, moreover, our dissenting colleague fails to acknowledge that we would hardly avoid a circuit split if we were to affirm the ruling below. Given the holdings by the Seventh Circuit in Snowden, 72 F.4th at 247, and the Tenth Circuit in Logsdon, 91 F.4th at 1357, the dissent's favored approach would deepen one.

The dissent does invoke Florida v. Jardines, 569 U.S. 1 (2013). But that case does not show that the location of the alleged misconduct here makes the context new.

Unlike Bivens and this case, Jardines involved an alleged search, not a claim of excessive force. See id. at 6-7. The distinction is significant. An excessive force claim takes aim at the extent of the force used against the person rather than the extent to which an expectation of privacy has been infringed or a trespass has occurred. So, Payton v. New York, 445 U.S. 573 (1980), and United States v. Karo, 468 U.S. 705 (1984), are no different from Jardines in that they also implicate concerns about privacy rather than excessive force. And because Quinones-Pimentel, 85 F.4th at 71-72, like Jardines, involved an unlawful search, the dissent's reliance on it is similarly misplaced.

That there may be a greater likelihood of other people being present in a parking lot may bear on the privacy interests involved. But we do not see how, in its nature, the physical

- 27 -

location being a parking lot on its own bears on the reasonableness of the level of force used, such that the involvement of this location risks "alter[ing] the policy balance that initially justified the cause[] of action recognized in Bivens" as "a separation-of-powers matter." Snowden, 72 F.4th at 244, 247.

Insofar as our focus is on the nature of the allegedly unconstitutional conduct alleged, we also do not see how allowing a damages action here would risk any more "disruptive intrusion" into the "functioning of other branches" than Bivens itself already permits. Abbasi, 582 U.S. at 140. The right asserted here is the same as that asserted in Bivens -- a right under the Fourth Amendment against the excessive use of force by officers at the successor agency in Bivens.

## C.

We come, then, to the final feature of this case that the defendants contend makes the context in which Arias's excessive force claims arise "meaningfully different" -- and so new. That feature, on which the District Court also relied, is the post-Bivens enactment in 1988, through an amendment to the IGA, of an administrative mechanism for lodging a complaint about misconduct by a federal law enforcement officer. For the reasons explained below, we are not persuaded that this legislative development renders this context new, even accounting for the other supposedly distinguishing factual circumstances addressed above.

**1.**

To start, we recognize that the District Court understood Egbert to require the conclusion at step one that the IGA's administrative remedy rendered the context for Arias's excessive claims new. We also recognize that Egbert held that a plaintiff could not assert a Fourth Amendment claim for damages against a federal Border Patrol agent for the use of excessive force in part because the existence of an administrative process for lodging misconduct complaints against the agent was a "special factor" that counseled against authorizing the Bivens cause of action there. See Egbert, 596 U.S. 493-94, 497-98.

The Supreme Court expressly noted in Egbert, however, that, in so holding, it was addressing only the second step of the Bivens analysis, not the first. Id. As the Supreme Court explained, the Ninth Circuit had held below that the Fourth Amendment claims in that case arose in a new context. Id. at 494.

Moreover, the Ninth Circuit had not deemed the context new because there was an administrative remedial scheme for lodging complaints against federal Border Patrol agents. Boule v. Egbert, 998 F.3d 370, 387 (9th Cir. 2021), rev'd on other grounds, 596 U.S. 482 (2022). It had done so only for other reasons. Id. In fact, the defendants had not invoked that administrative scheme as a reason to conclude that no Bivens remedy was available. See Egbert, 596 U.S. at 497 n.3. The Ninth Circuit then went on to

hold, at the second step of the Bivens analysis, that, notwithstanding the existence of other alternative remedies, Egbert, 998 F.3d at 387, 391-92, there were no special factors that counseled against extending the Bivens remedy to the new context. So, in seeking review in the Supreme Court, the defendants were challenging only that latter aspect of the Ninth Circuit's holding, which they did by for the first time invoking the presence of the administrative remedy. See Egbert, 596 U.S. at 497 n.3.

As a result, in Egbert, the Supreme Court held only that, at the second step of the analysis, the administrative remedy there counseled against extending the Bivens remedy to a new context. It did not hold that the administrative remedy in and of itself made the context new. Nor did it have occasion to decide whether such a remedy in and of itself ever could render a context new.

**2.**

Even though the precise holding of Egbert does not require us to conclude that the IGA's administrative remedy makes the context here new, we still must decide whether such a conclusion is warranted on some other basis. But we note up front that there is good reason for us to be wary of arguments that there is.

The Supreme Court has been clear that "it is this Court's prerogative alone to overrule one of its precedents." State Oil

Co. v. Khan, 522 U.S. 3, 20 (1997). It is thus of some significance that, although Congress amended the IGA to create the administrative remedy that supposedly spelled Bivens's demise nearly forty years ago, see Inspector General Act Amendments of 1988, Pub. L. No. 100-504, 102 Stat. 2515 (1988), the Supreme Court has repeatedly and recently declined to overrule Bivens, see, e.g., Abbasi, 582 U.S. at 134 (reaffirming the "continued force" of Bivens within its existing context and observing that "no congressional enactment has disapproved of" the three original Bivens decisions). And, in doing so, the Court has recognized that the "undoubted reliance" on "the settled law of Bivens in th[e] common and recurrent sphere of law enforcement" is itself a "powerful reason[] to retain it in that sphere." Id.; see also id. (noting that Bivens not only "vindicate[s] the Constitution by allowing some redress for injuries," but also "provides instruction and guidance to federal law enforcement officers going forward"); cf. Dickerson v. United States, 530 U.S. 428, 443 (2000) (declining to overrule Miranda v. Arizona, 384 U.S. 436 (1966), in part because "Miranda has become embedded in routine police practice to the point where the warnings have become part of our national culture").

If we were to conclude that the IGA makes the context here new, however, then we would have to endorse the view that the remedy Bivens recognized is no longer available, notwithstanding

the Court's determination that there are "powerful reasons to retain it." Abbasi, 582 U.S. at 134. And we would also have to believe that this state of affairs has prevailed for nearly four decades, but that no one, including the Supreme Court, has noticed. For, if the original Bivens cause of action were no longer available due to the IGA's amendment in 1988, then there would have been no need for the Court to have considered the need for Bivens's extension in cases in which similar administrative complaint mechanisms were available. Yet, the Court has done so nonetheless. See Hernandez, 589 U.S. 93; Egbert, 596 U.S. at 497 (considering whether to "superimpos[e]" a Bivens remedy onto an administrative remedy that allows "[a]ny person[]" to "lodge a complaint" with the Department of Homeland Security's Office of Inspector General (quoting 8 C.F.R. § 287.10(b))).[5] And it would be hard to understand why in 2017 the Court thought it important to account for "the undoubted reliance" on the "settled law of Bivens" by "federal law enforcement officers going forward" if it

---

[5] The dissent asserts that the length of time that has passed since the IGA's adoption provides no reason to be skeptical that it spelled the end of Bivens seemingly for all claims against federal law enforcement officers. The dissent asserts that this passage of time reveals only that Congress has not seen fit to review the silently buried Bivens cause of action during that time. But this misapprehends our reason for emphasizing the vintage of the IGA. During that time, the Court has itself repeatedly reaffirmed Bivens, which was a curious thing for it to be doing if that remedy was already a thing of the past.

were evident by then that the Bivens remedy had been unavailable for nearly three decades.  Abbasi, 582 U.S. at 134.

We do not lightly ascribe to the Supreme Court a misapprehension about the continuing vitality of its own precedents.  And, as a lower court, we are required to follow the Court's precedents, not treat them as but shells of their former selves.  See Agostini v. Felton, 521 U.S. 203, 237 (1997) ("[W]e do not hold[] that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent.").

All that said, the Court has not been presented with the precise question before us today:  Does the IGA's administrative mechanism for lodging complaints place a claim that otherwise arises in the same context as Bivens in a new one?  So, we must look closely at the relevant precedents, including Egbert itself, to determine whether they require the District Court's conclusion that Bivens, in essence, has been long dead.  For the reasons we next explain, we are not persuaded that they do.

**3.**

The Court has directly considered, in applying the first step of the analysis, how an alternative remedy bears on whether a context is new in exactly one case:  Abbasi.  There, the plaintiffs, like the plaintiff in Carlson, alleged "prisoner mistreatment" resulting in "compelling" injury.  582 U.S. at 147.

- 33 -

*Abbasi* reaffirmed the viability of the damages remedy that *Carlson* recognized. *Id.* at 134, 140. But the Court then concluded, at the first step of the analysis, that the context was new. *Id.* at 149.

*Abbasi* did so with reference, in part, to remedies "that were not considered in the Court's previous *Bivens* cases." *Id.* at 148. Thus, it does make clear that previously unconsidered alternative remedies may be relevant at the first step, and it thereby accords with its own instruction that a "case might differ in a meaningful way because of . . . the presence of potential special factors that previous *Bivens* cases did not consider." *Id.* at 139-40 (emphasis added).

Nonetheless, *Abbasi* did not suggest that the mere existence of a previously unconsidered administrative mechanism for lodging misconduct complaints made the context new. And that was so even though, by the time of *Abbasi*, such a previously unconsidered administrative mechanism -- the Administrative Remedy Program (ARP), 28 C.F.R. § 542 -- was in place.

The *Abbasi* Court was well aware, moreover, of the ARP, which it knew had not been considered in *Carlson* and which provided that inmates could "file[]" "grievances" regarding "an issue which relates to any aspect of their confinement[]." *Malesko*, 534 U.S. at 74 (quoting 28 C.F.R. § 542.10 (2001)). Indeed, in *Malesko*, the Court had explicitly relied on the ARP's remedy in declining

to extend the Carlson remedy to a new class of defendants at the second step of the analysis. Id. at 74. And Abbasi even cited to that portion of Malesko's analysis repeatedly, see 582 U.S. at 136, 137, 140, 145, including in its discussion at the first step of whether the context was new, id. at 139.

At the first step, however, Abbasi identified meaningful differences other than the presence of the ARP. Specifically, the Court first pointed to the fact that the plaintiffs in Abbasi, unlike the plaintiff in Carlson (who alleged under the Eighth Amendment that prison officials' provision of inadequate medical care resulted in acute harm, see Carlson, 446 U.S. at 16 n.1), alleged that a warden's supervisory failures resulted in continuing violations under the Fifth Amendment, see 582 U.S. at 148. The Court then also observed that, seemingly in consequence of this difference, the plaintiffs in Abbasi had remedies other than damages that the plaintiff in Carlson did not. And the Court identified those remedies as being only a writ of habeas corpus, "an injunction requiring the warden to bring his prison into compliance with [prison] regulations[,] . . . or some other form of equitable relief." Id.

Finally, Abbasi pointed to "legislative action" that Carlson had not considered as a meaningful difference. Id. Here, the Court focused on the enactment of the Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA),

which had mandated among other things that prisoners avail themselves of the ARP before filing suits against prison officials.[6] Indeed, in referencing the PLRA, the Court in Abbasi explicitly observed that in an earlier case it "ha[d] said in dicta that the [PLRA's] exhaustion provisions would apply to Bivens suits." Abbasi, 582 U.S. at 148-49; see Porter v. Nussle, 534 U.S. 516, 524 (2002) ("Thus federal prisoners suing under Bivens v. Six Unknown Fed. Narcotics Agents, must first exhaust inmate grievance procedures just as state prisoners must exhaust administrative processes prior to instituting a § 1983 suit." (citation omitted)). But Abbasi did not suggest that the ARP in and of itself made the context there new. It explained that because the PLRA addressed when and how suits may be brought against prison officials without providing a damages remedy, that statute arguably "suggest[ed that] Congress chose not to extend the Carlson damages remedy to cases involving other types of prisoner mistreatment." Abbasi, 582 U.S. at 149, 148 (emphasis added).

---

[6] Although the ARP existed at the time that Carlson was decided, Koprowski v. Baker, 822 F.3d 248, 256 (6th Cir. 2016) (citing 44 Fed. Reg. 62248-51 (Oct. 29, 1979)), it was a remedy that Congress had not "affirmatively . . . requested or required." McCarthy v. Madigan, 503 U.S. 140, 149 (1992) (noting that the ARP was "neither enacted nor mandated by Congress"). After Carlson, however, Congress required the exhaustion of that administrative remedy through the PLRA. See Woodford v. Ngo, 548 U.S. 81, 8485 (2006).

Accordingly, while <u>Abbasi</u> addressed the import of alternative remedies at the first step, it did not do so in a way that suggests that an administrative remedy like the IGA's in and of itself makes a context new, such that the presence of that remedy would render the context new even in a case in which the plaintiff alleged the exact same type of prisoner mistreatment as the plaintiff in <u>Carlson</u> alleged. In fact, despite the presence in <u>Abbasi</u> of the previously unconsidered congressionally blessed ARP, the Court focused its new-context analysis in that case only elsewhere.

**4.**

Of course, there is only so much insight that can be gleaned from what the Court did not do in <u>Abbasi</u>. But the fact that <u>Abbasi</u> did not rely on the ARP at the first step would be less worthy of note if the Court had elsewhere -- even once -- relied on the introduction of such an administrative remedy to find a context new. As it turns out, though, we have not come across any case in which the Court has done so. Nor do the defendants identify one.

The dissent seems to suggest that it has found a few such cases. The only one that the dissent identifies that in fact considers alternative remedies in applying the first step, though, is <u>Abbasi</u> itself. Otherwise, to support its contention that, under Supreme Court precedent, the presence of an alternative remedial

structure is sufficiently meaningful to create a new context, the dissent relies exclusively on the Court's statements regarding step two. See Egbert, 596 U.S. at 493 ("If there are alternative remedial structures in place, 'that alone,' . . . is reason enough to 'limit the power of the Judiciary to infer a new Bivens cause of action.'" (emphasis added) (quoting Abbasi, 582 U.S. at 137)); Goldey v. Fields, 606 U.S. 942, 944-45 (2025) (explaining that the fact that "'an alternative remedial structure' already exists" is a "'special factor[]' counsel[ing] against . . . extending Bivens" (emphasis added)); Malesko, 534 U.S. at 70, 74 (listing the presence of alternative remedies as one "reason[] that foreclose[s] [Bivens's] extension here" (emphasis added)); Bush v. Lucas, 462 U.S. 367, 388 (1983) (referring to "whether an elaborate remedial system . . . should be augmented by the creation of a new judicial remedy" (emphasis added)).

We do not see how the language about step two that the dissent relies on demonstrates that the presence of an alternative remedial structure is sufficiently meaningful to create a new context at step one. The Court reiterated just this past Term that we only reach step two "if" we first conclude that "the case is 'different in a meaningful way' from the cases in which th[e] Court has recognized a Bivens remedy" and thus "presents 'a new Bivens context.'" Goldey, 606 U.S. at 944 (quoting Abbasi, 582 U.S. at 139); see id. (explaining that "[i]f [the case presents a

- 38 -

new context], we then ask whether there are 'special factors'" that counsel against extending Bivens to that new context (emphasis added)).

The dissent does appear to take issue with the need for us to adhere to the two-step framework, seemingly suggesting that what once were two steps now are better understood as one. It does so, apparently, based on the idea that any factor that would counsel hesitation in extending Bivens to a new context is necessarily also a factor that makes a context new. But, insofar as the dissent finds support for that position in Egbert, we fail to see how it is there.

Egbert was itself decided at the second step of the analysis. And, our own precedents do not comport with such a reading of Egbert. See Quinones-Pimentel, 85 F.4th at 70 (explaining, after Egbert, that "[i]f the case presents no meaningful differences (and thus no new context), the analysis ends there and relief under Bivens is available").

True, Egbert did state, as we have noted, that the "two steps . . . often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." 596 U.S. at 492 (emphasis added). Egbert also characterized its prior "expla[nation] that a new context arises when there are 'potential special factors that previous Bivens cases did not consider'" as an "example" of how

the "two steps . . . often" merge.  Id. (quoting Abbasi, 582 U.S. at 140).

Egbert supported that proposition, though, by citing Abbasi.  And that case simply instructs that the presence of "potential special factors that previous Bivens cases did not consider" is one way in which "[a] case might differ in a meaningful way."  Abbasi, 582 U.S. at 139-40 (emphasis added).

Moreover, in the paragraph preceding that statement, the Court in Egbert reiterated that "whether [a] case presents 'a new Bivens context'" depends on whether it is "'meaningful[ly]' different from the three cases in which the Court has implied a damages action."  Egbert, 596 U.S. at 492 (alteration in original) (quoting Abbasi, 582 U.S. at 139).  Thus, while Egbert observed that "a new context arises when there are 'potential special factors that previous Bivens cases did not consider,'" id. (quoting Abbasi, 582 U.S. at 140), we do not understand the Court to have impliedly rejected Abbasi's core premise that a "potential special factor that previous Bivens cases did not consider" makes a context new only if that factor makes the context different in a way that is meaningful.  See Nat'l Pork Producers Council v. Ross, 598 U.S. 356, 373-74 (2023) (emphasizing that the Court's opinions cannot "always . . . be parsed as though . . . dealing with the language of a statute" and "must [instead] be read with a careful eye to context" (quoting Reiter v. Sonotone Corp., 442 U.S. 330, 341

(1979))).  In that respect, Egbert's "example" accords with the general requirement that, to reach step two, the context must be "'meaningful[ly]' different" from the one in which the Bivens remedy has been recognized by the Court.  Id. (alteration in original) (quoting Abbasi, 582 U.S. at 139); see also Goldey, 606 U.S. at 944; Quinones-Pimentel, 85 F.4th at 70.

Consistent with this understanding of Egbert, we emphasize that when a "potential special factor[] that previous Bivens cases did not consider" shows that the case is meaningfully different, that same "special factor[]" will almost always counsel against allowing the damages remedy.  596 U.S. at 492 (quoting Abbasi, 582 U.S at 140).  But, conversely, if a "potential special factor[] that previous Bivens cases did not consider" fails to show the case is meaningfully different, then the case does not present a new context and the plaintiff may use the existing Bivens cause of action.  Id. (quoting Abbasi, 582 U.S. at 140).

After all, in that latter type of case, a court need not "create a damages remedy."  Id.  It need only apply the one that the Court already has recognized.  Accordingly, Egbert's "single question" could not be presented.  Id.

Thus, we do not understand Egbert, in observing that the "two steps . . . often resolve to a single question," to have relieved courts of their duty to engage in the general new-context inquiry.  Indeed, in the sentences surrounding that observation in

- 41 -

Egbert, the Court makes clear that its focus is on whether a court may "fashion" or "creat[e] . . . a new judicial remedy."  Id. at 493 (quoting Bush, 462 U.S. at 388).  And, in a context that does not meaningfully differ from the existing Bivens cases, a court would not be "infer[ring]," "fashion[ing]," or "creat[ing]" a "new" "Bivens cause of action," id., because a Bivens cause of action plainly already exists, id. at 493 n.2 (noting that there are contexts "in which a Bivens remedy is generally available" (quoting Hui v. Castaneda, 559 U.S. 799, 807 (2010))).  So, the inquiry into whether there is reason to hesitate before entering that uncharted ground need not be undertaken.

For these reasons, we cannot agree with the dissent's seeming suggestion that Egbert's "single question" discussion itself requires that we bypass the inquiry in this case as to whether the IGA's mechanism for lodging complaints administratively constitutes a meaningful difference from Bivens. Even if that scheme provides a reason not to extend the Bivens remedy, it does not follow that the scheme constitutes the kind of meaningful difference that gives rise to a new context.  And we are especially reluctant to conclude otherwise, when doing so necessarily would spell Bivens's demise in every context involving a Fourth Amendment claim.

The dissent also finds support for its position in the Court's latest word on Bivens -- Goldey v. Fields, 606 U.S. 942

(2025). But we do not find that support there any more than we find it in Egbert.

In Goldey, the Court reiterated that "[t]o determine whether a Bivens claim may proceed, the Court has applied a two-step test." Id. at 944. Then, in accord with the undisputed positions of the parties and the Court of Appeals in that case, see Fields v. Fed. Bureau of Prisons, 109 F.4th 264, 270 (4th Cir. 2024) ("Fields concedes that this case arises in a new context. We are thus faced solely with step two . . . ."), the Court explained that the "case arises in a new context." Goldey, 606 U.S. at 944; see also id. at 943 (explaining that an "Eighth Amendment excessive-force claim" was not among the three contexts in which the Court had "recognized" that "implied Bivens causes of action were permitted"). It was then -- and only then -- that the Court went on to address, as one would expect at the second step of the analysis, whether there were "'special factors' counsel[ing] against recognizing an implied Bivens cause of action" in that new context. Id. at 944. Analyzing those factors, it "declined to extend Bivens to [this] new context[]." Id. at 945. If anything, then, the two-step framework is, after Goldey, even more solidly supported in the precedent than it already was.

In sum, we cannot agree that any precedent of the Court holds that a previously unconsidered alternative remedy akin to the IGA's administrative mechanism for lodging complaints in and

- 43 -

of itself suffices to render a context new. There is none that does.

**5.**

The dissent also suggests that our own circuit's precedents compel the conclusion that the IGA's administrative remedy independently renders this context new. It first suggests that we decided the question of whether an alternative remedy is a special factor that independently creates a new context in González, 864 F.3d 45. But the "special factors" language that the dissent relies on in that case plainly draws from our analysis at step two. See id. at 53 & n.5. We thus cannot agree that we decided there the antecedent question of whether the presence of a remedy that was not previously considered is necessarily a difference that is meaningful.

The dissent also invokes our recent precedent in Waltermeyer v. Hazlewood, 136 F.4th 361 (1st Cir. 2025). But that case did not involve any of the differences that we are presented with here. The claims in Waltermeyer were premised on Carlson, rather than Bivens itself. Id. at 362. So, we cannot see how the differences that we found meaningful there -- none of which concerned the presence of an administrative means of lodging complaints about misconduct -- are relevant to the question presented here. Nor does the dissent explain why such a comparison would be appropriate.

**6.**

The dissent relies as well on cases from our sister circuits finding a context to be new. However, none of those cases, save for one, held that there was an alternative remedy that in and of itself made the context there new. See Kalu v. Spaulding, 113 F.4th 311, 327-29 (3d Cir. 2024) (noting that "several factors render[ed] [the] claim meaningfully different" including "a different kind of officer misconduct" and the "heightened risk" of "judicial intrusion into a different aspect of federal prison administration"); Logsdon, 91 F.4th at 1358-60 (first explaining that the case presented a new context because it involved a "new category of defendant" and then describing "the availability of alternative remedies" as an "independent ground for not . . . creat[ing] a remedy" (emphasis added)); Johnson v. Terry, 119 F.4th 840, 859 (11th Cir. 2024) (listing the constitutional right and injury as among the "differences" that "ma[d]e th[e] [case] a new context"); Lewis v. Bartosh, No. 22-3060-PR, 2023 WL 8613873, at *2 (2d Cir. Dec. 13, 2023) (finding a new context, in part, based on the new category of defendant).[7]

---

[7] The dissent also cites Bell v. Leavenworth U.S. Penitentiary, No. 24-3156, 2025 WL 1650187 (10th Cir. June 11, 2025), but that case did not discuss the role of alternative remedies at any step of the Bivens analysis, let alone the first, id. at *2.

The one exception is Noe v. United States Government, No. 23-1025, 2023 WL 8868491, at *3 (10th Cir. Dec. 22, 2023). But that case is an unpublished, nonbinding order. And it rested on that panel's understanding that its prior decision, Silva v. United States, 45 F.4th 1134 (10th Cir. 2022), required it to foreclose Bivens relief when faced with an alternative remedy "even if the factual context is not meaningfully different from" an existing Bivens case, Noe, 2023 WL 8868491, at *3.

But while Silva is itself precedential, Noe's interpretation of Silva's holding is dubious. Silva explicitly recognized that a meaningful difference did place the plaintiff's claim into a new context -- it noted that the "distinction between" the plaintiff's "excessive force" claim and the "deliberate indifference to medical needs claim" in Carlson was "sufficient to conclude that [his] claim would require an extension of Bivens" and thus arose within a new context. 45 F.4th at 1137; see also id. ("[H]is claim clearly constitutes an expansion of Bivens.").

**7.**

That no case has turned up that adopts the dissent's view of the state of Bivens law should not be surprising. In Bivens, Carlson, and Davis, the Court each time considered the context in which the claimed constitutional violation arose. In light of that context, it then weighed the need for a damages remedy against the individual officer and concluded that it was

- 46 -

proper to imply one. Thereafter, the Court has reaffirmed each of those rulings despite knowing of administrative remedies it had not earlier considered (to say nothing of the damages remedy that the FTCA was amended to provide).[8]

Thus, while it is true that when the context is new, we, as a lower court, must account for an administrative remedy in weighing whether to extend an existing Bivens remedy, we see little to suggest that we may treat the existence of that remedy as an invitation to set aside the Court's prior calculus. And we are particularly disinclined to infer that such a suggestion was intended when doing so would entail the conclusion that the Bivens remedy has long been a relic, despite the Court having affirmed its continuing vitality and noted the "powerful reasons to retain it." Abbasi, 582 U.S. at 134.

**8.**

We make one last observation: Congress itself has given no indication that -- contrary to its intent as expressed through the Westfall Act -- it meant to "abrogate Bivens" in creating the administrative remedy at issue here. Hernandez, 589 U.S. at 111

---

[8] The Court has also demonstrated its awareness of the IGA in the context of internal administrative remedies within other federal agencies. See Dep't of Transp. v. Ass'n of Am. R.Rs., 575 U.S. 43, 52 (2015) (explaining that the IGA requires Amtrak to maintain an inspector general "much like [other] governmental agencies"); NASA v. FLRA, 527 U.S. 229, 237-39 (1999) (discussing the IGA in the context of NASA).

n.9.  Certainly, nothing in the text of the IGA suggests such an intent.  And, unlike the PLRA, to which Abbasi gave weight in finding the context there new, the IGA does not purport to address when or how Bivens suits may be brought.

Nor have we been able to identify any aspect of the IGA's statutory history that suggests a legislative aim of limiting Bivens suits that otherwise would be available.  In fact, Congress initially authorized the relevant IGA remedy here just one month before it "explicit[ly] except[ed]" "Bivens claims" from the Westfall Act's exclusivity requirement.  Hui, 559 U.S. at 807; compare Inspector General Act Amendments of 1988, Pub. L. No. 100-504, 102 Stat. 2515 (1988) (enacted October 18, 1988), with Federal Employees Liability Reform and Compensation Act of 1988, Pub L. N. 100-694, 102 Stat. 4563 (1988) (enacted November 18, 1988).

To be sure, we are not addressing the distinct question -- independent of the two-step framework -- of whether Congress has "preclude[d] a claim under Bivens" by "affirmatively foreclos[ing] one."  Egbert, 596 U.S. at 493 n.2; see, e.g., Hui, 559 U.S. at 808 (concluding that "the text of [the statute involved there] plainly indicates that it precludes a Bivens action against petitioners for the harm alleged in this case").  But the IGA's statutory history does have relevance to the step-one issue that is at hand.

To the extent that, through the Westfall Act, Congress expressed its "clear" intent to "le[ave] Bivens where it found it," we cannot see why the IGA -- which was enacted one month before the Westfall Act -- should not be understood to reflect that same intent. Hernandez, 589 U.S. at 111 n.9; cf. Merck & Co. v. Reynolds, 559 U.S. 633, 648 (2010) ("We normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent."). It would be surprising, to say the least, for Congress to have made a point of leaving Bivens where it found it if just a month before it had taken action that it understood to have left Bivens for dead.

As a result, the absence of any mention of Bivens in the IGA, even in its legislative history, offers no sign that Congress intended to leave Bivens in worse shape than the Westfall Act did. Cf. Abbasi, 582 U.S. at 148-49 (considering "legislative action suggesting that Congress does not want a damages remedy"). If anything, the silence offers further reason for us not to do what the Court has so far declined to do -- declare that, because of a decades-old legislative change codifying a means of lodging internal complaints, the remedy recognized in Bivens may no longer be asserted in any context, no matter how similar the context otherwise is to the one involved in Bivens itself. See Chisom v. Roemer, 501 U.S. 380, 396 n.23 (1991) ("Congress' silence in this

regard can be likened to the dog that did not bark." (citing A. Doyle, Silver Blaze, in The Complete Sherlock Holmes 335 (1927))).

## D.

In the end, our task is to determine whether this case arises in a new context relative to Bivens and then, if it does, to determine whether there are special factors counseling hesitation in extending the damages remedy that Bivens recognized. That first step of that analysis calls on us "to apply a familiar mode of judicial reasoning": "determin[ing] if the case before [us] fits within the Court's still-valid -- but now quite limited -- precedent."  Snowden, 72 F.4th at 244.

We thus must decide whether the differences between this case and Bivens are meaningful, given the Court's reaffirmation of the result of the weighing that it did in Bivens in recognizing the implied cause of action for damages there.  For the reasons we have explained, we conclude that the differences here are not meaningful, in part because the relevant precedents fail to show that the IGA is a legal development that "would require reweighing the costs and benefits of a damages remedy against federal officials" as to the excessive force claims in this case in a way that the Court has not already weighed them in recognizing the cause of action in Bivens itself.  Id. at 244.  Were we to conclude otherwise, we would have to conclude that the Court has been

reaffirming the existence of a remedy that had long since ceased to exist.

Perhaps the Court will be convinced to conclude that the IGA's administrative mechanism for filing internal complaints suffices to make this context new and so to trigger a new weighing that supersedes the earlier one. But, from where we sit, we cannot conclude that the Court already has come to that conclusion and thereby invited lower courts to render unavailable in any context the remedy that it has deemed necessary in the context that Bivens itself presented.

Accordingly, we conclude that the District Court erred in relying on the IGA to decide that Arias's excessive force claims arise in a new context. Moreover, the defendants have failed to identify any other factual circumstances that, taken alone or together, suggest that the differences between the plaintiff's excessive force claims and those in Bivens are in any sense meaningful.[9] We therefore conclude that the context here is not

---

[9] In reaching this conclusion, we emphasize that we do not intend to cast doubt on the possibility that other excessive force claims may, in fact, present a new context. The outcome could be different if, for example, the plaintiff alleged claims against a new category of defendants. Compare Carlson v. Green, 446 U.S. 14, 25 (1980) (recognizing a Bivens claim for Eighth Amendment claims of inadequate medical treatment against federal prison officials), with Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 70 (2001) (holding that an Eighth Amendment inadequate medical treatment claim against a private prison operator presented a new context).

new and that, as a result, we need not reach step two of the <u>Bivens</u> analysis.  See <u>Quinones-Pimentel</u>, 85 F.4th at 70 (explaining that if there is no new context "the analysis ends there and relief under <u>Bivens</u> is available").  Accordingly, we reverse the grant of summary judgment to the defendants on Arias's excessive force claims.

## IV.

Arias's failure-to-intervene claims are a different matter.  The District Court also relied on the existence of the IGA's alternative remedy to dismiss those claims.  But, in addition, it identified another difference that it concluded was meaningful: the absence of any bystander liability claims in <u>Bivens</u> itself.  Because Arias does not raise on appeal any arguments that challenge this independent basis for the District Court's ruling, we have no reason to conclude that ruling was erroneous.  <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

## V.

The judgment granting summary judgment to the defendants is **<u>affirmed</u>** as to Arias's failure-to-intervene claims and **<u>reversed</u>** and **<u>remanded</u>** for further proceedings consistent with this decision as to Arias's excessive force claims.

**- Concurring and Dissenting Opinion Follows -**

- 52 -

**LYNCH**, <u>Circuit Judge</u> **(Concurring In Part and Dissenting In Part).** I concur in the majority's affirmance of entry of summary judgment in Arias' failure-to-intervene claim. I respectfully dissent from the majority's holding reversing entry of summary judgment against Arias' Fourth Amendment excessive force claims. The majority misreads Supreme Court commands when it concludes that congressional amendment of the IGA, post-<u>Bivens</u> is not a "meaningful difference." The majority further errs in concluding that even if the IGA were a meaningful difference, the IGA would not present a "new context." The majority incorrectly reasons that "conclud[ing] otherwise would" require "conclud[ing], incongruously, that the <u>Bivens</u> remedy has been a dead-letter since the IGA's amendment, even though the Supreme Court has reaffirmed the existence of that remedy in the years after that now decades-old legislative development."

The majority's framing and answer are incorrect for a number of reasons. It is precisely when Congress has acted that the judiciary should not, to use the Supreme Court's terminology, "infer," "authorize," "enforce," "approve," "find," "prescribe," "recognize," "create," or "expand" a judicially created remedy for Fourth Amendment excessive force claims. Congress is assuredly aware of <u>Bivens</u> and it has decided that the IGA remains in effect and is good law. Statutes, like court opinions, do not become inoperative because they were enacted decades ago.

The premises of the majority's reasoning are themselves inaccurate. The Supreme Court has neither resolved a Fourth Amendment arrest excessive force case in the years since the IGA's passage, nor has it approved a single Bivens-type lawsuit since Carlson v. Green, 446 U.S. 14 (1980). Rather, the Court has repeatedly made it clear that it is up to Congress, not the courts, to determine whether to create mechanisms and remedies for alleged constitutional violations by federal officers. The judicially created Bivens Fourth Amendment excessive force cause of action and damages remedy is not a dead letter as to cases which have no meaningful differences with Bivens, but only as to those cases. The majority pays short shrift to the Article III concerns articulated by the Supreme Court that it is properly the function of Congress, not the federal courts, to authorize such causes of action.[10] Goldey v. Fields, 606 U.S. 942, 945 (2025) (per curiam), stated "[f]or the past 45 years, this Court has consistently declined to extend Bivens to new contexts," thus discrediting the majority's reasoning that the Court has somehow given new life to Bivens in the face of the IGA.

---

[10] "[T]he question whether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts. . . . That is true even if a court independently concludes that the Government's procedures are 'not as effective as an individual damages remedy.'" Egbert v. Boule, 596 U.S. 482, 498 (2022) (quoting Bush v. Lucas, 462 U.S. 367, 372 (1983)).

In my view, the majority's holding is not only directly contrary to many Supreme Court holdings, but it also exacerbates the existing splits among the circuits and introduces a new split.[11] Under the Court's latest guidance, the issue before us is whether this case arises even slightly in a new context. See id. at 944-45. The differences here are more than slight, including both that Congress has chosen to create the IGA administrative remedy and that there are other meaningful differences with Bivens. Arias' arrest for drug dealing was made pursuant to a warrant and thus on probable cause, and the assertion of excessive force arose from the officers' attempt to enforce the warrant in a highly public place, a mall parking lot where there was a significant risk to the public. Arias' claim is factually different and in a different context than the excessive force claim made years ago in Bivens.

There are several steps in the test which binds us for whether this claim for damages survives. See Egbert, 596 U.S. at 492-93. These steps start with whether the claim presents "'a new Bivens context' -- i.e., is it 'meaningful[ly]' different" from Bivens. Id. at 492 (alteration in original) (quoting Ziglar v. Abbasi, 582 U.S. 120, 139 (2017)); see also Hernandez v. Mesa, 589

---

[11] The Supreme Court may wish to address these circuit splits, reflecting the need for additional guidance to lower court judges, who in good faith have reached different outcomes.

U.S. 93, 102 (2020). The Supreme Court has identified a non-exhaustive list of what are "meaningful" differences and has included "special factors" on that list:

> Without endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples might prove instructive. A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider.

Abbasi, 582 U.S. at 139-140 (emphasis added). "Second, if a claim arises in a new context, a Bivens remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" Egbert, 596 U.S. at 492 (quoting Abbasi, 582 U.S. at 136). The Court has stressed that "[i]f there is even a single 'reason to pause before applying Bivens in a new context,' a court may not recognize a Bivens remedy." Id. (quoting Hernandez, 589 U.S. at 102).

The Egbert Court further held that "[w]hile our cases describe two steps, those steps often resolve to a single question: whether there is any reason to think that Congress might be better

- 56 -

equipped to create a damages remedy."  Id.  Applying Egbert's ruling that the two questions often resolve to a single question, Goldey decided the two steps simultaneously, demonstrating it was proper to do so.  See 606 U.S. at 944-45.  By contrast the majority holds it is error for a court not to take the first step first, and if the first step is not satisfied, then the case must be remanded to the district court, which cannot consider the second step before then.  That itself is error.  In this case, if not necessarily in all cases, the two steps resolve into one.

The Court has specifically held that even "small" differences suffice to create a "new context," and that "the new-context inquiry is easily satisfied."  Abbasi, 582 U.S. at 149. Hernandez explained that "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages [claim] was previously recognized." 589 U.S. at 103.  And in Egbert, the Court held that while the facts at issue there "involve[d] similar allegations of excessive force and thus arguably present[ed] 'almost parallel circumstances' [to Bivens] . . . these superficial similarities [we]re not enough to support the judicial creation of a cause of action."  596 U.S. at 495 (quoting Abbasi, 582 U.S. at 139).

In the decades since Bivens was decided, the Court "ha[s] come 'to appreciate more fully the tension between' judicially created causes of action and 'the Constitution's separation of

legislative and judicial power,'" and that unless a court exhibits the "utmost deference to Congress's preeminent authority in [creating a cause of action], it 'arrogat[e][s] legislative power.'" Egbert, 596 U.S. at 491-92 (second alteration in original) (quoting Hernandez, 589 U.S. at 100). The Court has further emphasized that "it is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation," and "[i]n most instances, . . . the Legislature is in the better position to consider if 'the public interest would be served' by imposing a 'new substantive legal liability.'" Abbasi, 582 U.S. at 133, 136 (quoting Schweiker v. Chilicky, 487 U.S. 412, 426-27 (1988)). Even seemingly small variations from Bivens are "meaningful" precisely because they inappropriately encroach on legislative power.

Egbert makes it even more clear that the IGA creates exactly such a new context:

> [A] court may not fashion a Bivens remedy if Congress already has provided, or has authorized the Executive to provide, "an alternative remedial structure." If there are alternative remedial structures in place, "that alone," like any special factor, is reason enough to "limit the power of the Judiciary to infer a new Bivens cause of action."

- 58 -

596 U.S. at 493 (citations omitted) (quoting Abbasi, 582 U.S. at 137). Egbert expressly held that an alternative remedial structure "alone" bars a Bivens remedy. Id. (quoting Abbasi, 582 U.S. at 137). The Supreme Court has repeatedly held that alternative remedies can create a "situation altogether different from Bivens." Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 73 (2001); see also Bush, 462 U.S. at 377-78.

The majority attempts, wrongly, to dismiss Goldey, but Goldey also held that no Bivens action was present because "'an alternative remedial structure' already exists," and that no Bivens cause of action exists when "Congress has actively legislated in the area . . . but has not enacted a statutory cause of action for money damages." 606 U.S. at 944. Goldey held it was error to recognize a Bivens claim because it "could have negative systemic consequences for [federal] officials." Id. That is true here.

The majority is incorrect in reading Abbasi as supporting its position that the existence of a congressionally created alternative remedy does not necessarily create a new context. Indeed, to the extent that Abbasi addressed the role of administrative remedies, it noted that the "case also ha[d] certain features that were not considered in the Court's previous Bivens cases and that might discourage a court from authorizing a Bivens remedy. As noted above, the existence of alternative remedies

usually precludes a court from authorizing a Bivens action."
Abbasi, 582 U.S. at 148; see also Administrative Remedy Program,
44 Fed. Reg. 62250 (Oct. 29, 1979) (to be codified at 28 C.F.R.
§ 542).

The Bivens Court had no occasion to consider the IGA,[12]
as Bivens was decided in 1971, prior to the enactment of the IGA.
Congress created the Inspector General Act of 1978, 5 U.S.C. ch. 4
(amended in 1988 to apply to the Department of Justice, Inspector
General Act Amendments of 1988, Pub. L. No. 100-504, 102 Stat.
2515 (1988)), and the Executive established the Office of
Professional Responsibility, 28 C.F.R. § 0.29c(c). These
structures create an administrative complaint process which
provides for formal investigation into allegations of DEA agent
misconduct, with potential consequences including disciplinary
action and criminal prosecution. That congressionally created
alternative structure alone should result in entry of judgment for

---

[12] The majority's reasoning that Congress demonstrated no
intent to abrogate Bivens with the creation of the administrative
remedies at issue asks the wrong question, as the Supreme Court
makes clear. It is also inconsistent with this circuit's prior
holding that Congress need not have explicitly identified the
remedial structure at issue as intended to supplant Bivens. In
González v. Vélez, we held that the issue is "whether there exists
an alternative process that Congress reasonably may have viewed as
an equally effective surrogate for an action brought directly under
the Constitution." 864 F.3d 45, 53 (1st Cir. 2017) (emphasis
added).

the defendants on these claims.[13]  Congress created an alternative structure that "vindicate[s] the Constitution by allowing some redress for injuries." Abbasi, 582 U.S. at 148.  Courts may not substitute for the congressionally created procedure and remedy a judicially created Bivens cause of action.  While Congress chose in the IGA not to provide the identical procedures and remedies as in Bivens, Egbert and its progeny make clear that is a choice for Congress to make.[14]

The majority seeks to minimize the significance of the IGA's remedial scheme by repeatedly asserting a straw man: that the Supreme Court has not overruled Bivens itself in the years since the IGA's passage.  But neither has the Supreme Court found a single case in which it has continued a Bivens remedy since Carlson, a case from the "heady days in which th[e] Court assumed common-law powers to create causes of action."  Egbert, 596 U.S.

---

[13] It is true that Hernandez found that the Federal Tort Claims Act (FTCA) is not an alternative remedy that abrogates Bivens. 589 U.S. at 111 n.9.  But Hernandez, which was decided before Egbert, says nothing at all about the IGA and thus does not support the majority's argument.

[14] The fact that an alternative remedial structure does not provide for money damages does not matter.  In Egbert, the Supreme Court rejected arguments that the alternative remedial structure at issue was inadequate because the defendant was not entitled to participate and had no right to judicial review, noting that "we have never held that a Bivens alternative must afford rights to participation or appeal."  Egbert, 596 U.S. at 497-98.  Abbasi likewise held that alternative remedies barred a Bivens remedy without any discussion of whether they provided for damages. Abbasi, 582 U.S. at 148.

at 491 (quoting Malesko, 534 U.S. at 75 (Scalia, J., concurring)). The majority thus attempts to read out of Egbert and its progeny the Court's main message: that lower courts should not in any way use Bivens to justify judicially created causes of action in cases like this. The "functional test" adopted by the majority is itself doubtful and neither congruent nor consistent with the Supreme Court's tests. And even if a functional test were the correct test, this case would fail it, as it would "alter the policy balance."

The majority's attempt to say that the existence of an alternative remedial structure qualifies as a "special factor" for purposes of the new-context analysis but does not amount to a "meaningful" difference is an outlier amongst our sister circuits, is also wrong, and creates a circuit split. The Second, Third, Tenth, and Eleventh Circuits have all held that alternative remedial structures create a "new context" or, more generally, categorically bar Bivens-type relief. See, e.g., Johnson v. Terry, 119 F.4th 840, 858 (11th Cir. 2024) ("[T]he context of these claims is different from the context of the claim in Carlson because there the Court did not consider whether there were alternative remedies . . . ."); Logsdon v. U.S. Marshal Serv., 91 F.4th 1352, 1359 (10th Cir. 2024) (identifying the existence of an alternative remedial structure as an "independent ground for not recognizing a Bivens action" (emphasis added)); Kalu v. Spaulding, 113 F.4th

311, 327-28 (3d Cir. 2024) (identifying the existence of an alternative remedial structure as a factor creating a new context); Lewis v. Bartosh, No. 22-3060, 2023 WL 8613873, at *1 (2d Cir. Dec. 13, 2023) (holding that "'[i]f a claim arises in a new context' -- such as if it involves 'a new category of defendants' -- or if there is an 'alternative remedial structure,' a Bivens remedy is generally 'unavailable'" (quoting Egbert, 596 U.S. at 492-93)); see also Silva v. United States, 45 F.4th 1134, 1141 (10th Cir. 2022) (holding that under Egbert, Bivens-type claims do not survive when an alternative remedial structure exists); Noe v. U.S. Gov't, No. 23-1025, 2023 WL 8868491, at *3 (10th Cir. Dec. 22, 2023) (holding that Bivens-type claim did not survive because of existence of alternative remedial structure even if facts were otherwise identical).[15]  The majority breaks with all of these circuits and adopts a holding that is sui generis.[16]

---

[15] The majority tries to discount the Tenth Circuit's decision in Noe.  While the Tenth Circuit's opinion in Noe was unpublished, that court reached substantially the same conclusion in the published Logsdon opinion, which held that "the availability of alternative remedies" there was an "independent ground for not recognizing a Bivens action."  Logsdon, 91 F.4th at 1359.

[16] The Ninth Circuit's decision in Watanabe v. Derr, 115 F.4th 1034 (9th Cir. 2024), reh'g denied en banc, 139 F.4th 1056 (2025), does not support the majority as it was not a Fourth Amendment excessive force case, provides almost no reasoning, and the government did not, apparently, present the special factors argument it has presented here.

Arias' case is also "meaningfully different" from Bivens in addition to the IGA because there are numerous factual and legal claim differences.  First, unlike Bivens, Arias was arrested pursuant to a warrant.  See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 389 (1971).  There was a judicial determination of probable cause[17] that Arias had committed crimes.  There was no such determination that Bivens had committed a crime, nonetheless officers entered his home and tried to arrest him.

Further, unlike Bivens who was arrested in his home, id., Arias was arrested in his car in a shopping mall parking lot. These facts present meaningful differences in an excessive force claim, which considers "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. 386, 396 (1989).  Both in effecting the arrest and in preventing any attempts by Arias to speed away to avoid arrest, the law enforcement officers had to account for the real dangers which were posed to the women, children, and men in the lot of the shopping mall.  Indeed, in circumstances where the

---

[17] In the months before Arias' arrest, "an undercover Drug Enforcement Administrative operative[] made several controlled purchases of fentanyl-laced heroin from" Arias.  Order on Defendants' Renewed Motion for Summary Judgment, Arias v. U.S., No. 17-cv-516-SM, ECF No. 56 at 3 (Jan. 19, 2021).

suspect may pose a threat to the arresting officers or others, or may flee, the Supreme Court has held that officers may reasonably use additional force to effectuate a seizure. See Scott v. Harris, 550 U.S. 372, 384-86 (2007); see also Bannon v. Godin, 99 F.4th 63, 79-83 (1st Cir. 2024) (reasonableness of force must be assessed in light of threat to officer and members of the public and so lethal force was reasonable), cert. denied, 145 S. Ct. 1048 (2025), reh'g denied, 145 S. Ct. 1347 (2025).

More than that, public parking lots and people's homes are different for Fourth Amendment purposes. Fourth Amendment interests are strongest in the home. See, e.g., Florida v. Jardines, 569 U.S. 1, 6 (2013) (noting that "when it comes to the Fourth Amendment, the home is first among equals" and that "the distinction between the home and the open fields is 'as old as the common law'" for purposes of determining whether an unlawful search has taken place (quoting Hester v. United States, 265 U.S. 57, 59 (1924))); United States v. Karo, 468 U.S. 705, 714 (1984)("[o]ur cases have not deviated from th[e] basic Fourth Amendment principle" that "private residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable"); Payton v. New York, 445 U.S. 573, 601 (1980)("To be arrested in the home involves not only the invasion attendant to all arrests but also

an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant . . . ." (citation omitted)).

The majority reasons that excess force is the same no matter these differences and so the differences cannot be meaningful. I disagree, but more importantly, Congress could easily find these differences meaningful. Congress could readily conclude arrests without warrant in the sanctity of the home are greater invasions of Fourth Amendment protections than attempts by law enforcement to effectuate arrest warrants in busy public mall parking lots. Each of these clear differences, whether taken alone or collectively, creates a "new context."[18]

The majority also magnifies existing circuit splits regarding other differences from Bivens. The Fourth, Fifth, and Sixth circuits have held that the existence of a warrant amounts to a meaningful difference from Bivens in Fourth Amendment claims.

_____

[18] Arias and the majority rely on Hicks v. Ferreyra, 64 F.4th 156 (4th Cir. 2023) and Snowden v. Henning, 72 F.4th 237 (7th Cir. 2023), as demonstrating the viability of Bivens-type claims. Yet these out-of-circuit cases are distinguishable on the very characteristics that place this case in a "new context": Hicks did not involve a warrant or an alternative remedial structure, see Hicks, 64 F.4th at 167, and the Snowden court did not involve a remedial structure other than the FTCA (and the Snowden court reasoned that the FTCA is not an alternative to Bivens-type actions), Snowden, 72 F.4th at 246 n.4. The majority also cites DeMayo v. Nugent, 517 F.3d 11 (1st Cir. 2008), but it too has little relevance, as it was decided well before Egbert and the line of Supreme Court cases that are controlling here.

See Annappareddy v. Pascale, 996 F.3d 120, 135 (4th Cir. 2021)("What Bivens involved was the Fourth Amendment right to be free of unreasonable warrantless searches and seizures; this case, by contrast, involves searches and a seizure conducted with a warrant."); Cantú v. Moody, 933 F.3d 414, 423 (5th Cir. 2019); Cain v. Rinehart, No. 22-1893, 2023 WL 6439438, at *3 (6th Cir. July 25, 2023). The majority disagrees. But the Cantú decision's own language shows the Fifth Circuit stated exactly that: One of the "[m]any measures" on which "Cantú's claims [we]re meaningfully different from the Fourth Amendment claim at issue in Bivens" was that the officers had not "entered his home without a warrant." Cantú, 933 F.3d at 423 (emphasis added). Since a new context arises whenever a claim is "'meaningful[ly]' different" from Bivens, the existence of a warrant produces a new context. Egbert, 596 U.S. at 492 (alteration in original) (emphasis added)(quoting Abassi, 582 U.S. at 139). The Seventh and Tenth circuits have held the opposite, with the latter court acknowledging this exact circuit split. See Snowden, 72 F.4th at 247; Logsdon, 91 F.4th at 1357 ("agree[ing]" with Snowden while recognizing "there is substantial authority to the contrary" as "[s]everal other circuits have said that a new Bivens context exists when federal officials execute a valid warrant"). By joining the Seventh and Tenth circuits rather than the majority position, this court exacerbates this existing and recognized split. And the majority

is in conflict with the holding of the Tenth Circuit in Rowland v. Matevousian that even "small" differences can create a new context for Bivens-type claims.  121 F.4th 1237, 1243-44 (10th Cir. 2024).

Additionally, the Fifth and Ninth circuits have held that challenged conduct occurring outside the home amounts to a meaningful difference from Bivens, see Byrd v. Lamb, 990 F.3d 879, 882 (5th Cir. 2021); Mejia v. Miller, 61 F.4th 663, 668 (9th Cir. 2023)[19], while the Seventh and Tenth circuits have held the opposite,  see Snowden, 72 F.4th at 247; Logsdon, 91 F.4th at 1357.

The majority also departs from this circuit's decision in González, which held that a different remedial structure is a meaningful special factor in denying Bivens relief.  See 864 F.3d at 53 ("The existence of such alternative processes is a special factor . . . .").[20]  In Quinones-Pimental, this Court likewise identified the existence of a warrant and the public arrest as

---

[19] The majority contends that Mejia is outside this split, as the challenged conduct in the case took place not merely outside the home, but on federal land.  That decision's emphasis on the out-of-home location of the conduct belies this reading.  See, e.g., Mejia, 61 F.4th at 668 ("More importantly, unlike Bivens, none of the events in question occurred in or near [the plaintiff's] home.").

[20] Quinones-Pimental, 85 F.4th 63, does not address the question of whether an alternative remedial scheme would have been a special factor sufficient to create a "new context" under step one; it had no need to do so, since other factual differences from Bivens were sufficient to establish a new context.  Id. at 70; see also Hornof v. United States, 107 F.4th 46, 65-66 (1st Cir. 2024) (same).

aspects of meaningful difference from Bivens.  See 85 F.4th at 71-72 ("[T]ake first the law enforcement actions at issue here, which differ entirely from those at issue in Bivens. . . . [N]o one's home nor their person (naked or otherwise) was searched without a warrant.").  And in Waltermeyer v. Hazlewood, 136 F.4th 361 (1st Cir. 2025), this court held that "factual and legal differences" between the plaintiff's claims and Carlson created a new context. Id. at 365.

I respectfully dissent.